*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0335p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

SHARON MCCARTHA,

                *Plaintiff-Appellant,*

    *v.*

NATIONAL CITY CORPORATION; NATIONAL CITY LONG-
TERM DISABILITY PLAN; NATIONAL CITY BANK OF
MICHIGAN/ILLINOIS,

                *Defendants-Appellees.*

> No. 04-1167

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-70406—John Corbett O'Meara, District Judge.

Argued: April 21, 2005

Decided and Filed: August 10, 2005

Before: SUHRHEINRICH and GILMAN, Circuit Judges; ACKERMAN, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Lawrence J. Breskin, Detroit, Michigan, for Appellant. Mark S. Allard, VARNUM, RIDDERING, SCHMIDT & HOWLETT, Grand Rapids, Michigan, for Appellees. **ON BRIEF:** Lawrence J. Breskin, Detroit, Michigan, for Appellant. Mark S. Allard, VARNUM, RIDDERING, SCHMIDT & HOWLETT, Grand Rapids, Michigan, for Appellees.

———————————

## OPINION

———————————

    SUHRHEINRICH, Circuit Judge. Plaintiff Sharon McCartha ("McCartha") appeals from the order of the district court granting judgment on the administrative record to Defendants National City Corporation ("National City") and National City Long-Term Disability Plan ("Disability Plan" or "Plan") (collectively "Defendants"), and from the order granting Defendants' motion for reconsideration in this action brought under 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA"). For the reasons that follow, we **AFFIRM**.

---

[*]The Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

## I.

McCartha was employed by Defendant National City Corporation. Under National City's Flexible Benefits Program ("Flex Plan"), McCartha elected to be covered by the Disability Plan. The Disability Plan is administered by National City.

On June 6, 2000, McCartha became disabled, and National City gave her a medical leave of absence. McCartha's subsequent application for short-term disability benefits was approved, and she began receiving benefits on June 12, 2000. The Plan also approved McCartha for long-term disability benefits, in the amount of $1,050 per month, beginning in December 2000. At that time McCartha was specifically informed that "payment of future benefits depends on certification of continuing disability, and on other applicable Plan provisions."

McCartha's treatment plan required her to make one appointment per month with her doctor and one therapy session per month, on the same day. After learning that McCartha had missed her December 15, 2000 appointment, the Disability Plan contacted McCartha. McCartha acknowledged missing the appointment, but maintained that she was ill, and stated that she had rescheduled for December 26, 2000. McCartha missed that appointment as well as the next one scheduled for January 5, 2001.

On January 5, 2001, Dr. Quadir told the Disability Plan that he believed that McCartha's depression had become "resistant." Also on January 5, 2001, the Disability Plan contacted Theresa Savel, McCartha's therapist, to find out the date of McCartha's next scheduled appointment. Savel stated that McCartha had not shown for, or rescheduled, her appointment. Savel also told the Disability Plan that McCartha had a history of missing appointments and then calling for prescription refills, or coming in on a walk-in basis on Mondays or Fridays when she knew that Dr. Quadir was in the office. Savel further stated that McCartha had called in on January 5, 2001 to get her prescriptions refilled, but that Dr. Quadir refused to refill her prescriptions unless she was seen. Finally, Savel remarked that McCartha's lack of progress was likely due to her not being seen on a regular basis. In a follow-up discussion on January 8, 2001, Savel told the Disability Plan that McCartha had multiple missed appointments.

On January 9, 2001, the Disability Plan terminated McCartha's benefits based on her failure to comply with the terms of the treatment plan. The letter referenced Section 6.1 of the Disability Plan:

> A Participant's continued eligibility for Long-Term Disability benefits is conditioned upon the Participant's furnishing to the Named Fiduciary, at the time the Participant makes a claim for Benefits and from time to time thereafter, at the Named Fiduciary's request, medical verification of the Long-Term Disability, obtained from independent medical examinations made by a physician acceptable both to the Participant and the Named Fiduciary.

The letter also stated that under Section 6.4, the Plan excludes "any condition for which the Participant refuses to be treated by a licensed physician or other medical practitioner approved by the Named Fiduciary."

The letter then explained that the Disability Plan had verified with McCartha's doctor and therapist that she was not scheduling appointments as required and had missed numerous doctor and therapy appointments over a six-month period, detailing the appointments missed. The letter stated that "[y]ou have not been compliant with your full treatment protocol which has delayed your progress. Based on the above Exclusion you are no longer eligible for benefits."

McCartha appealed the decision to the Plan's Claims Appeal Committee ("Appeal Committee"). In her appeal, McCartha explained that she had always been compliant with her treatments to the extent she was able, and that she "never refused any treatments or refused to be treated by a licensed physician." She offered various excuses for each missed appointment, including illnesses and weather.

The Appeal Committee addressed her appeal at its April 12, 2001 meeting. In a letter dated April 23, 2001, the Appeal Committee requested an extension of time to consider McCartha's appeal, explaining that "[d]ue to limited information available for our review, the committee was not yet able to make a determination on your appeal." The Appeal Committee asked McCartha to "supply additional medical information" and to have her physician complete an enclosed questionnaire.

Prior to the Appeal Committee's meeting on June 20, 2001, McCartha requested an extension of time to respond to the April 23, 2001 letter, because she had a doctor's appointment scheduled for June 26, 2001. The Appeal Committee acquiesced, and agreed to delay its decision until June 28, 2001. McCartha failed to submit any information, however, and, on June 28, 2001, the Appeal Committee denied McCartha's appeal and upheld the denial of benefits.[1] The letter stated in relevant part:

> The Committee considered the information and opinions provided by all physicians who examined you. No current opinions indicate that you are prevented from engaging in any activity on account of a physical or mental impairment. Further, no information was presented to demonstrate compliance with your treatment protocol (as we requested via the Physician Questionnaire and letter dated April 23, 2001).

On January 8, 2003, McCartha filed a claim in state court seeking long-term disability benefits from the Disability Plan under the ERISA Act, and disability discrimination under state law. On January 30, 2003, Defendants removed the suit to federal court. On November 4, 2003, McCartha stipulated to the dismissal of her state-law claim. On December 22, 2003, the district court granted Defendants' motion for judgment on the administrative record. Adopting a de novo review, the district court found that the Disability Plan's decision was "fully supported by the administrative record." Specifically, the court noted that it was undisputed that "Plaintiff missed several doctor's appointments and failed to schedule multiple therapy sessions" and "failed to supply information regarding her treatment plan after the Board granted her request for an extension of time." The court concluded that the "administrative record demonstrates that Plaintiff's admitted failure to follow her treatment plan falls within the Plan's exclusion for refusal of treatment." On February 19, 2004, the district court granted Defendants' motion for reconsideration, ruling that the Disability Plan contained a grant of discretionary authority to determine eligibility for benefits and to construe the terms of the plan. The court therefore held that the proper standard of review was arbitrary and capricious, and, because this standard is more deferential to defendants than that employed in its initial opinion, the court left its substantive findings unaltered.

## II.

The parties do not dispute that the Disability Plan is an employee benefit plan as defined in ERISA. *See* 29 U.S.C. § 1002(1) & (3). Section 502(a)(1)(B) gives a participant or beneficiary the right to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Our review of the ERISA administrative decision is limited to evidence presented to the Appeal Committee. *See Wilkins v. Baptist Healthcare Sys. Inc.*, 150 F.3d 609, 617-20 (6th Cir. 1998).

## III.

## A.

First, McCartha challenges the standard of review used by the district court. We review the denial of benefits under § 502(a)(1)(B) de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*

---

[1] The record also reflects that at 8:35 a.m. on June 28, 2001, the Plan left McCartha a voice mail message informing her that the Appeal Committee had not received any information from her, and that the meeting was at 10:30 a.m. that day.

*Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When a plan affords discretion to an administrator or fiduciary, the arbitrary and capricious standard of review applies. *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 456 (6th Cir. 2003). Under this standard, the decision is affirmed if "'rational in light of the plan's provisions.'" *Id.* at 456-57 (quoting *Borda v. Hardy, Lewis, Pollard & Page*, *P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998)).

McCartha contends that nothing in the copy of the Disability Plan as produced by Defendants during discovery, and as presented to the district court as part of its motion for judgment on the administrative record, states that the plan administrator has any discretionary authority. McCartha therefore claims that she correctly argued before the district court that the de novo standard of review applied.

The documents provided to the district court in support of Defendants' motion for judgment on the administrative record included the following provision: "(ADMINISTRATION) This Plan shall be administered by the Named Fiduciary in accordance with the procedures and provisions of the Flex Plan." As the record before the district court did not originally contain the Flex Plan referenced in the Disability Plan, McCartha argues that the arbitrary and capricious standard of review was inapplicable.[2] Further, in her response to Defendants' motion for judgment on the administrative record, McCartha clearly argued that the de novo standard of review applied.

However, McCartha was on notice that the plan language relevant to the district court's standard of review was to be found in the Flex Plan, because the Disability Plan clearly incorporated it. In fact, McCartha quoted this exact provision in her brief in response to Defendants' motion for judgment on the administrative record. The absence of that precise language before the district court on summary judgment is *not* analogous to the court reviewing materials not part of the administrative record, although she makes a veiled argument to that effect.

In any event, because McCartha's claim fails under either standard of review, as the district court found, the point is moot. The Flex Plan provides in pertinent part that the Plan Administrator "shall have such duties and powers as National City may prescribe as necessary to administer this Plan and each Benefit Plan," and that the Plan Administrator and each Named Fiduciary shall have the power "to construe and interpret this Plan and each Benefit Plan and to decide all questions of eligibility." This language clearly confers discretion on the Plan. *Cf. Marks*, 342 F.3d at 457 (discretion conferred by plan language providing that "'[t]he Plan Administrator shall make the rules and regulations necessary to administer the Plan and shall have the responsibility and discretionary authority to interpret the terms of the Plan, determine eligibility for benefits and to determine the amounts of such benefits'"); *Borda*, 138 F.3d at 1066 (discretion conferred by plan language stating that "[t]he Administrator shall have the power to make determinations with respect to all questions arising in connection with the administration, interpretation, and application of the Disability Plan, as well as "establish procedures, correct any defect, supply any information, or reconcile any inconsistency . . . as it deems necessary" to carry out the purposes of the plan").

Further, because National City's Plan is self-funded, and National City management employees make the decisions regarding termination of benefits, we must take into account the administrator's self-interest in applying the arbitrary and capricious standard of review. *Marks*, 342 F.3d at 457. However, this Court has rejected the notion that the conflict of interest inherent in a self-funded and self-administered plan alters the standard of review. *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998).

## B.

McCartha contends that the Plan improperly denied benefits under an exclusion for "refusing" to be treated because the record establishes that she did not "refuse" treatment, but simply missed some of her

---

[2]Defendants concede that the Flex Plan itself was not before the district court until Defendants filed their motion for reconsideration.

appointments. McCartha further asserts that the Plan failed to carry its burden of showing that she refused to be treated because the Plan did not investigate the legitimate reasons she presented for each missed appointment. An ERISA plan, not the participant, has the burden of proving an exclusion applies to deny benefits. *Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 580 (6th Cir. 2003) (citation omitted).

The evidence in the administrative record supports the Appeal Committee's decision to terminate McCartha's disability benefits on the basis of this exclusion. *See Univ. Hosps. of Cleveland v. Emerson Elec.*, 202 F.3d 839, 846 (6th Cir. 2000) (stating that this Court must defer to an administrative appeal committee's decision if "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome"). The record reflects that McCartha's treatment plan called for her to attend monthly doctor appointments and monthly therapy sessions, as well as to take the prescribed medications. McCartha's own treating physician and therapist established McCartha's noncompliance. As of January 5, 2001, Dr. Quadir refused to provide her with any additional prescription medications because she had missed numerous scheduled appointments. Savel confirmed that she had also missed several therapy sessions, and that she had a pattern of showing up merely to get prescription refills. Although McCartha argues that her behavior does not constitute a "refusal" under various dictionary definitions, we cannot say that the Plan acted arbitrarily and capriciously in concluding that McCartha's repeated failure to follow her treatement protocol was tantamount to a refusal to be treated. Significantly, the Disability Plan gives the named fiduciary discretion "to construe and interpret this Plan" as well as to decide questions of eligibility. *See Peruzzi*, 137 F.3d at 433 (holding that where ERISA plan gives the administrator discretion to interpret its terms, the administrator's interpretation must be upheld unless it is arbitrary and capricious or unreasonable). In short, the record supports the Appeal Committee's decision under Section 6.4 of the Plan.

McCartha claims that the Disability Plan did not meet its burden because it failed to refute her legitimate reasons for missing appointments. Again, the record itself undermines McCartha's argument. The Disability Plan called Savel to confirm McCartha's assertion that she had scheduled an appointment for December 26, 2000. In so doing, the Disability Plan was informed that the office was not even open that day. The Disability Plan also asked Savel if McCartha had a walk-in appointment on January 5, 2001. Savel stated that McCartha was a no-show for that appointment. In any event, McCartha's litany of excuses cannot save her claim. Based on the undisputed report of her own treating physician, McCartha herself frustrated all efforts for proper treatment. Thus, the Committee's decision cannot be considered arbitrary and capricious on this basis, even when considering the Committee's self-interest. *Cf. Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984-85 (6th Cir. 1991) (holding that insurance company's decision to terminate benefits was not arbitrary or capricious, despite its self-interest, where two psychiatrists, including the plaintiff's own treating physician, had indicated that the plaintiff's prolonged depressive reaction was in partial remission).

### C.

McCartha also argues that the Disability Plan violated her due process rights under 29 U.S.C. § 1133 because it failed to give her notice that the Disability Plan was also denying her claim on the basis that she was no longer disabled.

ERISA requires a plan to provide participants with adequate notice of the reasons for denying benefits and to afford a reasonable opportunity for a full and fair review. 29 U.S.C. § 1133. Section 1133 states that

> every employee benefit plan shall--
> > (1) provide adequate notice in writing to any participant or beneficiary whose claims for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133**3**; *see also Marks*, 342 F.3d at 459.

We review de novo the legal question of whether the procedure employed by the fiduciary in denying the claim meets the requirements of § 1133. *Kent v. United Omaha Life Ins. Co.*, 96 F.3d 803, 806 (6th Cir. 1996).

This Court has adopted a "substantial compliance" test in deciding whether denial notices meet the requirements of § 1133. *See Marks,* 342 F.3d at 460; *Kent,* 96 F.3d at 807-08. In making that assessment, the court must consider all the communications between the administrator and plan participant. *Marks*, 342 F.3d at 460. "In this analysis, it is crucial for us to determine whether the plan administrators fulfilled the essential purpose of § 502–notifying [the claimant] of their reasons for denying [her] claims and affording [her] a fair opportunity for review. *Id.* (citing *Kent*, 96 F.3d at 807). If the denial notice is not in substantial compliance with § 1133, reversal and remand to the district court or to the plan administrator is ordinarily appropriate. *See id.* at 461 (citing *Vanderklok v. Provident Life & Acc. Ins. Co.*, 956 F.2d 610, 619 (6th Cir. 1992)). However, a remand is not required if it would "represent a useless formality." *Kent*, 96 F.3d at 807.

According to McCartha, unbeknownst to her, the Disability Plan referred her appeal to Janet O'Bryant, a nurse case manager, for review. O'Bryant concluded that McCartha had "failed to provide any additional medical to support her claim," noting that the record did not contain any additional office notes from Dr. Quadir or Savel. O'Bryant also stated that

> [f]or a diagnosis of major depression, the claimant should be seen at least once a week in the office, and less depressed patients should be seen in the office every 10-14 days. Pharmocotherapy response needs to be evaluated 4-6 weeks and there should be at least a 25% decrease in symptoms. These are the guidelines for major depression.

O'Bryant noted that although McCartha had been diagnosed with major depression, there was no objective medical evidence to support continued disability at that time, that no psychological testing had been done, and that McCartha was not being seen on a regular basis by either the psychiatrist nor the therapist. O'Bryant therefore concluded that the medical information did not substantiate a finding of continued total disability.

McCartha claims that the January 9, 2001 letter identified only one reason for terminating her benefits, namely her failure to comply with her treatment schedule, and failed to timely notify her that the

---

**3**The Department of Labor regulations further explain that

> The notification shall set forth, in a manner calculated to be understood by the claimant--
> (i) The specific reason or reasons for the adverse determination;
> (ii) Reference to the specific plan provisions on which the determination is based;
> (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;
> (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review[.]

29 C.F.R. § 2560.503-1(g) (2005).

termination of benefits would also be premised on the fact that there was no objective medical evidence to support continued disability, as O'Bryant concluded.

The June 28, 2001 final decision letter provides two reasons for terminating McCartha's benefits: (1) "[n]o current opinions indicate that you are prevented from engaging in any activity on account of a physical or mental impairment;" and (2) "[f]urther, no information was presented to demonstrate compliance with your treatment protocol (as we requested via the Physician Questionnaire and letter dated April 23, 2001)." Although McCartha received advance notice that her benefits would be terminated based on the failure to comply with her treatment plan as excluded under Section 6.4 of the Disability Plan, she was not notified that the Disability Plan was considering terminating her due to the lack of a current opinion certifying continuing disability per Section 6.1.

Defendants first argue that the December 11, 2000 letter which approved McCartha's claim for long-term disability benefits specifically stated that "payment of future benefits depends on certification of continuing disability[.]" This letter cannot satisfy ERISA's notice requirement to provide a "specific" reason for the denial of benefits because it was written before McCartha's benefits were denied.

Defendants next argue that the March 20, 2001 letter (which is identical to January 9, 2001 letter) specifically cited to Section 6.1 of the Plan, which requires ongoing "medical verification of Long-Term Disability," thus satisfying ERISA's requirement for a specific reason for the denial of benefits. Defendants then note that on April 23, 2001, the Plan asked McCartha to have her doctor complete a questionnaire regarding her ongoing status as disabled and the treatment plan in effect for her at that time.

This argument must be rejected. Although the correspondence referred to Section 6.1, the letters did not indicate that McCartha's failure to comply with the provision was "the specific reason for such denial." 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(g). In fact, the January 9 and March 20 letters stated that "[b]ased on the above Exclusion [6.4] you are no longer eligible for benefits." In other words, this correspondence created the distinct impression that McCartha's "refusal" to comply with her treatment plan under Section 6.4 was the sole basis of the denial of benefits. This conclusion is reinforced by the fact that the June 28, 2001 letter explicitly distinguished the two bases for termination: "[f]urther, no information was presented to demonstrate compliance with your treatment protocol (as we requested via the Physician Questionnaire and letter dated April 23, 2001)." Thus, the Disability Plan itself viewed the questionnaire as merely addressing the compliance question. Although the questionnaire inquired as to the status of McCartha's disability status, it did not expressly ask the treating physician to certify that she was currently disabled.

In short, Defendants were not in substantial compliance with the requirements of § 1133 because McCartha was never timely informed that the failure to provide current medical opinions as to her long-term disability would be one of the bases for the termination of her benefits. We must still determine whether a remand would be fruitful, however.

In urging that a remand is required, McCartha relies on *White v. Aetna Life Ins. Co.*, 210 F.3d 412, 417-18 (D.C. Cir. 2000). There, the plaintiff, a registered nurse who suffered from osteoarthritis, applied for and received short-term disability benefits based on a short-term disability certification by Dr. Engh, an orthopedic surgeon. Upon being informed in December 1996 that her short-term disability benefits were about to end, the plaintiff applied for long-term disability benefits. The plaintiff submitted a leave of absence certificate from Dr. Engh along with a report in which he described his diagnosis as "osteoarthritis" and stated that White needed hip replacement surgery. An Aetna claims representative orally informed the plaintiff that her claim had been denied. Aetna gave three reasons for the denial: (1) the Plan had not been able to contact the plaintiff's orthopedic surgeon over a three-day period; (2) the plaintiff's internist had refused to confirm that White was disabled to work; and (3) White should have already undergone hip replacement surgery. *Id.* at 415. White asked Aetna for a written confirmation but received none.

On February 26, 1997, White's attorney informed Aetna that the hip replacement surgery was scheduled for April 1 and asked that her claim be reconsidered. *Id.* The attorney also attached a copy of Dr. Engh's certificate as well as a more detailed report from Dr. Engh. *Id.*

On March 13, 1997, Aetna sent a written denial stating, "[d]ue to the lack of sufficient clinical information to support your request, your period of disability could not be recertified." *Id.* at 415. Aetna also informed White's attorney by phone that one of the reasons for the denial was the lapse in time between the August physical examination and the April surgery. *Id.*

In her appeal of the denial of benefits, White included a letter from her internist explaining that her blood pressure was not sufficiently under control to clear her for surgery before April. *Id.* at 416. The internist also opined that White was disabled. *Id.* at 416. Also included was an updated medical report from Dr. Engh stating that White was completely disabled. *Id.* Aetna denied the request for review as well-beyond the sixty-day appeal period. *Id.*

The district court granted summary judgment to Aetna, finding that the March 13 denial notice, together with Aetna's oral communications with White, substantially complied with ERISA and its regulations. *Id.*

The Court of Appeals reversed. The court noted that the March 13 notice and Aetna's conversations with the plaintiff identified three reasons for denying White's claim. The court held that had these been the only reasons for the denial, Aetna would have substantially complied with § 1133. *Id.* at 417. However, the record revealed that Aetna's denial rested on a fourth reason, provided in Aetna's statement of material facts, namely "Aetna's concern" that "Dr. Engh had refused to certify White as disabled." *Id.* The court was unable to find any evidence that Aetna ever communicated this reason to White or her lawyer. *Id.* The court further noted that, at oral argument, Aetna's counsel conceded that there was no such evidence. *Id.* The Court of Appeals held that "[n]ot telling White that her claim had been denied in part because Dr. Engh had failed to certify her as disabled amounts to a major omission." *Id.* at 417-18. The court noted that based on the March 13 notice and phone calls, White did not have "any way of knowing that to perfect the claim, White needed to get Dr. Engh to certify her as disabled." *Id.* at 418. Thus, the court concluded that Aetna had failed to give White a "specific reason" for denying her claim and failed to tell her the additional information necessary to perfect her claim so as to be in substantial compliance with § 1133. *Id.* at 418. The *White* court therefore ordered a remand because both the plaintiff's doctor and internist found her to be totally disabled and Aetna had not reviewed the plaintiff's claim on the merits. *Id.* at 418.

Like the *White* case, the Disability Plan failed to provide McCartha with one of the specific reasons for terminating her benefits. However, *White* is distinguishable in a critical respect. In *White*, Aetna never considered the merits of the plaintiff's appeal. *Id.* at 418. Here, the Appeal Committee ruled on the merits, and provided two independent reasons for denying her benefits. Furthermore, this additional evidence would not render arbitrary and capricious the Disability Plan's other reason for denying benefits–McCartha's refusal to comply with her treatment plan. *Cf. id.* at 418 (noting in dicta that a prejudice test might be worthwhile prior to ordering a remand in cases where a claimant has already received a full and fair review of the decision denying his or her claim) (citing *Kent*, 96 F.3d at 807). Despite numerous opportunities from the Disability Plan, McCartha failed to provide proof that she was complying with her own doctor's treatment plan. Thus, a remand would be a "useless formality" because the Disability Plan still provided a reasonable basis for denying her benefits–her refusal to comply with her treatment plan. *See Kent*, 96 F.3d at 807 (stating that "[i]n light of the plan language giving the fiduciary broad discretion to make coverage decisions, additional evidence is only pertinent to the extent that it shows that the fiduciary's decision was an abuse of discretion"). In sum, the Disability Plan's procedural violation does not require a substantive remedy. *Id.*

## IV.

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**