*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0016p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

METROPOLITAN LIFE INSURANCE COMPANY,
> *Plaintiff-Appellee,*

*v.*                                                        No. 06-5009

RUSSELL D. CONGER,
> *Defendant-Appellant.*

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 04-00570—Jennifer B. Coffman, District Judge.

Argued: November 1, 2006

Decided and Filed: January 16, 2007

Before: MOORE, ROGERS, and GIBSON, Circuit Judges.[*]

---

### COUNSEL

**ARGUED:** Lee E. Sitlinger, SITLINGER, McGLINCY, THEILER & KAREM, Louisville, Kentucky, for Appellant. William D. Pandolph, SULLOWAY & HOLLIS, P.L.L.C., Concord, New Hampshire, for Appellee. **ON BRIEF:** Lee E. Sitlinger, SITLINGER, McGLINCY, THEILER & KAREM, Louisville, Kentucky, for Appellant. William D. Pandolph, SULLOWAY & HOLLIS, P.L.L.C., Concord, New Hampshire, Angela Logan Edwards, Lisa H. Thomas, WOODWARD, HOBSON & FULTON, Louisville, Kentucky, for Appellee.

---

### OPINION

---

KAREN NELSON MOORE, Circuit Judge. In 2002, Plaintiff Russell D. Conger filled out an on-line application and purchased a long-term care insurance policy under the Federal Long-Term Care Insurance Program ("FLTCIP"). When he sought to collect benefits, Metropolitan Life Insurance Company ("MetLife") refused to pay, voided the policy, and then sued for rescission and declaratory relief. Because we conclude that MetLife abused its discretion by voiding the policy and that Conger had no independent duty to disclose information that MetLife neglected to request, we **REVERSE** the district court's judgment and **REMAND** the case with instructions to dismiss MetLife's complaint.

---

[*] The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1

## I. BACKGROUND

### A. Statutory Background

In 2000, Congress passed the Long-Term Care Security Act ("LTCSA" or "the Act"), 5 U.S.C. §§ 9001-09, to ensure that long-term care insurance would be available to federal employees. "Long term care is chronic care that an individual may need for the rest of his or her entire life." *Gunson v. James*, 364 F. Supp. 2d 455, 458 (D.N.J. 2005). By passing the LTCSA, Congress intended to create "affordable options for dealing with the catastrophic expenses of nursing home care, home care, assisted living, and other forms of long-term care services." S. Rep. No. 106-344, 2000 WL 970179 at 18, *quoted in Gunson*, 364 F. Supp. 2d at 458.

The Act gave the Office of Personnel Management ("OPM") the responsibility to enter into group contracts (known as "master contracts") with qualified insurance carriers, and thereby establish and administer a program through which federal employees could obtain long-term care insurance. 5 U.S.C.§§ 9002(a), 9003(a). The result was the FLTCIP. *Gunson*, 364 F. Supp. 2d at 457-58.

Under the FLTCIP, the federal government does not pay for insurance, nor does it guarantee the availability of long-term care insurance to its employees. *Id.* at 458. Instead, the LTCSA merely "establishes minimal underwriting standards for master contracts, and delegates the establishment of further underwriting requirements to the qualified carriers and OPM." *Id.* (citing 5 U.S.C. § 9002(e)). Ultimately, the carrier determines which employees are eligible for insurance under the program and makes this determination based on the guidelines negotiated with OPM. *Id.*

### B. Factual Background

#### 1. Conger's Long-Term Care Insurance Application and Claim

On July 11, 2002, Conger, who was a 54-year-old employee of the National Weather Service at the time, applied for insurance under the FLTCIP by completing an online application. The application contained a series of questions necessary for a five-year coverage period, and a separate set of questions required of applicants seeking an unlimited coverage period. Question 5 in the latter group asked, "Within the last 10 years, have you had, been diagnosed with or been treated for any of the following conditions?" The conditions listed included:

- Diabetes (excluding gestational diabetes);

- Disorder of the Brain (e.g. tremor, seizure disorder, head injury, tumor, infection), Neuropathy, Syncope, Paralysis, any Chronic or Progressive Neurological Disorder;

- Memory Loss; and

- Muscle Disorder (e.g., fibromyalgia, polymyalgia rheumatica, chronic fatigue syndrome).

Conger responded "NO" to each of the conditions listed under Question 5. Joint Appendix ("J.A.") at 67.

On July 20, 2002, Long Term Care Partners ("LTCP") sent Conger a letter approving his application, and indicating that the policy would be effective October 1, 2002. LTCP is a joint venture formed by John Hancock Life Insurance Company and MetLife for the sole purpose of providing and administering long-term care insurance under the FLTCIP. *Gunson*, 364 F. Supp. 2d

at 458-59. Each person enrolled for coverage under the FLTCIP receives insurance from one of the two companies. Conger received his coverage from MetLife, but LTCP administered the policy.

With the letter, LTCP enclosed a schedule of benefits and a benefit booklet. The benefit booklet's first page of text states:

## NOTICES: PLEASE READ CAREFULLY!

**Important:** Our decision to issue coverage was based upon your responses to the questions on your application. . . . We may deny benefits or rescind your insurance coverage if your answers are incorrect or untrue for any reason.

J.A. at 73, 187. A later provision of the benefit booklet states that the insurer "ha[s] discretion to interpret the terms, conditions and provisions of the Group Policy, this Benefit Booklet and your Schedule of Benefits." J.A. at 92, 218.

In April 2003, Conger retired from the National Weather Service after over thirty years of service. On August 29, 2003, he submitted a claim to LTCP for long-term care benefits stemming from difficulties with mobility and balance.

### 2. LTCP's Investigation of Conger's Past Medical History

LTCP initiated an investigation of Conger's prior medical history. It discovered that Conger had experienced difficulties with his balance for at least five years and had sought medical attention for this problem. More specifically, LTCP learned that on September 4, 1998, Conger sent a letter to Dr. Prospero Ishkanian stating,

I still have the balance problem and have to hold on to anything I can grab to move about. If I don't hold onto something I feel like I will lose my balance completely.

. . .

I have noticed that for the past 6 months to 1 year that my walking becomes more difficult after 6 hours on shift and gets progressively worse and by the time I work my entire shift my walking becomes very bad and seems to be related to poor balance.

J.A. at 134.

These difficulties led Conger to seek medical help from a number of different doctors over the following four years. For instance, Conger made several visits to Dr. John R. Morris (an ear, nose, and throat specialist) in late 1998 and early 1999, apparently to determine whether sinus problems caused his unsteadiness. In December 1998, a doctor's note after an MRI reported that Conger was suffering from "[e]xtensive sinusitis," but also noted that Conger's "[b]rain demonstrate[d] no significant abnormality, essentially normal for patient's age. Specifically, I see no cerebellar abnormality." J.A. at 138.

Shortly thereafter, Conger began seeing a group of neurologists, including Drs. Robert S. Tillett and Walter G. McFarland. On April 20, 1999, one of the doctors sent a letter to Morris reporting the results of a muscle biopsy. In this letter, the neurologist noted that the "right quadricep muscle biopsy material [was] consistent with inactive mild neuropathic muscle changes" and that "[t]here was note of Type II myofiber grouping implying a neurogenic process." J.A. at 141. MRIs performed in 1999 did not produce any clear diagnoses, but the radiologists indicated that Conger

had degenerative spinal disc changes, J.A. at 142, and sinus opacification, J.A. at 143. The notes from Conger's November 23, 1999 MRI indicate a "[n]egative MRI of the brain." *Id.*

Conger continued visiting Tillett. In his notes after a follow-up visit in April 2000, Tillett indicated that Conger had "a gradually progressive ataxia" and that his "symptoms [we]re gradually getting worse." J.A. at 144. However, Tillett also labeled Conger's condition "very puzzling," noted that Conger's two brain MRIs were "normal," and refrained from any diagnosis. *Id.* He stated his impression that "Mr. Conger has a syndrome with spastic paraparesis with possibly some mild sensory changes . . . and maybe some mild cognitive impairment. . . . He does not have any obvious underlying systemic illness." *Id.* Similarly, after seeing Conger in November 2002, Tillett's impression was that "Mr. Conger has a central process involving sensory pathways, corticospinal tract pathways—basically diffuse bilateral dysfunction. He is not ataxic in the cerebellar sense. His imbalance is more of a nonspecific coordination dysfunction that I think reflects his position loss as well as mild corticospinal tract dysfunction." *Id.* at 152. Tillett ordered a third MRI, which again revealed no abnormalities.

### 3. LTCP's Rejection of Conger's Claim

On September 25, 2003, LTCP sent Conger a letter rescinding his policy for unlimited benefits, but leaving in force his policy for a five-year benefit period. The letter stated that Conger's medical records revealed "a medical history of Diabetes Mellitus type 2, . . . progressive ataxia, cognitive impairment and a syndrome with spastic paraparesis." J.A. at 179. LTCP concluded that Conger incorrectly had answered Question 5 on his application for insurance by stating that he did not have diabetes, a brain disorder, memory loss, or a muscle disorder.

On September 29, 2003, Conger requested a review of LTCP's denial of unlimited benefits, emphasizing that his three MRIs were normal and that his doctors indicated that ataxia was only a symptom, not a diagnosis. In response, LTCP undertook an internal review. On November 5, 2003, Mary Lou Asbell of LTCP faxed a request for review to Dr. Carolyn Jackson, a physician working for MetLife. Two days later, Jackson sent a letter stating that she had reviewed the records and in her opinion, "the medical records, dating from 9/4/98 through 3/18/03, clearly document a progressive neurological disorder." J.A. at 181. Jackson further noted that "[s]ymptoms consistent with of [sic] a progressive neurological disorder that have resulted in significant neurological deficits and/or impairment are a reason for declin[ing an application for insurance] whether or not an actual diagnosis is given." J.A. at 182. Jackson's letter did not discuss whether the medical records revealed a history of diabetes, memory loss, or muscle disorder, nor did it address the multiple MRIs that revealed no abnormalities.

The same day it received Jackson's letter, LTCP sent a letter to Conger confirming its decision to rescind his unlimited long-term care coverage, basing its decision solely on Conger's symptoms consistent with a progressive neurological disorder and omitting any reference to diabetes, ataxia, cognitive impairment, or spastic paraparesis. This letter further told Conger that the decision was final and that no further review was available.[1]

---

[1] Although neither party mentions it, the policy provides for additional steps in the extrajudicial-dispute-resolution procedure. Under the "Appeals" section of the benefit booklet, disputes over coverage decisions must progress through an appeals committee and an independent third party. MetLife does not provide any explanation for not following this procedure or for telling Conger that the denial of benefits and rescission could not be further reviewed when the policy apparently provided to the contrary.

## C. Procedural Background

On September 29, 2004, MetLife filed a complaint in the U.S. District Court for the Western District of Kentucky seeking (1) rescission and (2) a declaratory judgment that either the contract for unlimited benefits was void ab initio or that MetLife was entitled to rescind the contract. MetLife filed an Amended Complaint seeking the same relief on November 1, 2004. Substantively, MetLife's Amended Complaint pleads two claims. The first claim, for rescission, is based solely on Conger's response to Question 5. The second claim, for declaratory relief, is based on "the defendant's concealment and/or failure to disclose material facts regarding his medical condition." J.A. at 23-24 (First Am. Compl. at 7-8).

On April 29, 2005, MetLife moved for judgment on the administrative record, and the district court granted MetLife's motion on October 12, 2005. *Metro. Life Ins. Co. v. Conger*, 396 F. Supp. 2d 777 (W.D. Ky. 2005). In its opinion, the district court concluded that MetLife had abused its discretion by concluding that Conger answered Question 5 incorrectly because the record did not show that Conger had a progressive neurological disorder. *Id.* at 781-82. However, the district court concluded that Conger materially misrepresented his condition by failing to discuss "his symptoms and overall health condition," which "would affect the risk undertaken by a long-term care insurance provider." *Id.* at 782. Accordingly, the district court concluded that MetLife's decision to rescind the unlimited benefits portion of the policy was justified. *Id.* Conger now appeals.

## II. JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction under a provision of the LTCSA granting federal courts jurisdiction over disputes arising under the FLTCIP. 5 U.S.C. § 9007. We have jurisdiction over Conger's appeal of the district court's final judgment under 28 U.S.C. § 1291.

The appropriate standard of review to apply to a district court's judgment on the administrative record in an LTCSA eligibility dispute is a question of first impression. In the related arena of ERISA benefit disputes, we review de novo a district court's judgment on the administrative record. *Evans v. Unumprovident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006). Neither party offers an argument for deviating from the de novo standard, nor do we see any reason to do so. Accordingly, we adopt the ERISA standard and hold that we review de novo a district court's judgment on the administrative record in an LTCSA eligibility dispute.

## III. ANALYSIS

First, we must determine whether Conger's response to Question 5 justified MetLife's decision to rescind Conger's coverage for an unlimited benefit period. Because we conclude that it did not, we must proceed to the second issue—whether MetLife was nonetheless justified in rescinding the coverage because Conger did not disclose his medical history on his application. Ultimately, we conclude that MetLife's decision was not justified under this rationale either, and accordingly we **REVERSE** the district court's judgment.

## A. Rescission Claim—The Effect of Conger's Response to Question 5

As noted above, Conger's response to Question 5 is the sole basis for MetLife's rescission claim. MetLife argues that Conger's medical history supports its conclusion that he had a progressive neurological disorder when he applied for insurance in July 2002. On this basis, it contends that Conger's answer to Question 5 was inaccurate, and that it was justified in rescinding Conger's policy for an unlimited coverage period. The parties dispute the standard of review that we should apply in evaluating MetLife's conclusion. MetLife claims that the policy vests it with discretion "to make determinations as to whether Conger's application was inconsistent with his medical records and whether rescission of his coverage was appropriate." MetLife Br. at 22.

Accordingly, it maintains that we should review for abuse of discretion its conclusions regarding Conger's condition when he filled out his application, as the district court did. Conger avers that we should review MetLife's conclusions de novo. Because the policy proclaims that MetLife has discretion regarding only "the terms, conditions and provisions" of the policy documents, J.A. at 92, 218, and not discretion to interpret insureds' medical records, we express some doubt that MetLife's discretion stretches as far as MetLife now urges. *See Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (en banc) (requiring ERISA disability insurance plan to contain "a clear grant of discretion" for insurer to benefit from abuse-of-discretion review), *cert. denied*, 531 U.S. 814 (2000).[2] We need not decide this issue, however, as we conclude that even under the more-deferential abuse-of-discretion standard, Conger's responses to Question 5 do not justify MetLife's decision to terminate his coverage.

In the similar context of ERISA cases, we have held that applying the abuse-of-discretion standard of review requires us to determine whether the insurer's decision was arbitrary or capricious. *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005). When the evidence supports "a reasoned explanation . . . for a particular outcome, that outcome is not arbitrary or capricious." *Id.* (quoting *Davis v. Ky. Fin. Co. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)). Ultimately, we must determine whether the insurer's decision "is the result of a deliberate, principled reasoning process and [whether] it is supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir.1991)). Accordingly, we review not only the insurer's conclusion, but also its reasoning.

MetLife has not clarified which prong of Question 5—"had," "had been diagnosed with," or "had been treated for"—it believes Conger answered inaccurately. The record is clear, however, that Conger was never diagnosed with a progressive neurological disorder, and MetLife provides no indication that he received any treatment for such a condition. Accordingly, no "deliberate, principled reasoning process," *Glenn*, 461 F.3d at 666, could support the conclusion that Conger was diagnosed with or treated for a progressive neurological disorder.

Whether Conger *had* a progressive neurological disorder in July 2002 is a thornier issue. Conger had visited multiple doctors, none of whom diagnosed him with any such disorder. Nonetheless, MetLife concluded that Conger had a progressive neurological disorder in July 2002. To support such a conclusion, we would expect the administrative record to document clearly a progressive neurological disorder that was undiagnosed due to the doctors' negligence or nonfeasance. However, our examination of the record makes clear that MetLife's determination that Conger had a progressive neurological disorder was not the result of a deliberate, principled reasoning process.

MetLife reached its conclusion only by ignoring substantial contrary evidence in Conger's medical records. For instance, MetLife did not address the doctor's December 20, 1998 conclusion that Conger's "[b]rain demonstrate[d] no significant abnormality, [and was] essentially normal for patient's age," or the doctor's statement that he saw "no cerebellar abnormality." J.A. at 138. Similarly, MetLife ignored Conger's multiple brain MRIs that revealed no problems. MetLife's communications to Conger (through LTCP) do not acknowledge these MRIs or even attempt to

---

[2] The various cases in which we have concluded that a policy grants an insurer or administrator discretion featured policies containing much more far-reaching discretion clauses. For instance, in *Evans*, the policy stated that the insurer had "discretionary authority to *determine your eligibility for benefits* and to interpret the terms and provisions of the policy." 434 F.3d at 875 n.4 (emphasis added). Similarly, in *McCartha v. National City Corp.*, 419 F.3d 437 (6th Cir. 2005), the policy stated that the administrator had the power "to construe and interpret this Plan . . . and to decide *all questions of eligibility*." *Id.* at 442 (emphasis added). *See also Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005) (plan gave insurer discretion "to construe the terms of th[e] policy and to determine eligibility hereunder.").

explain why they do not negate its conclusion regarding Conger's condition. The same is true of the internal communications between LTCP and MetLife's claim-review physician. MetLife also ignored multiple neurologists' failure to diagnose Conger with a progressive neurological disorder or even to note an impression in their charts that he had such a disorder. Further, MetLife ignored Dr. Tillett's impression that Conger's ataxia was not "cerebellar," which indicates that Conger's symptoms were not caused by a neurological disorder.

Our previous decisions make clear that an administrator abuses its discretion when it refuses to consider additional evidence presented in an insured's appeal of a coverage denial, *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 521 (6th Cir. 1998), or when it engages in a "selective review of the administrative record" to justify a decision to terminate coverage. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381 (6th Cir. 2005). Here, the administrator, in reviewing the insured's medical records, focused on slivers of information that *could be* read to support a denial of coverage and ignored—without explanation—a wealth of evidence that directly contradicted its basis for denying coverage. Such a decision-making process is not deliberate or principled, and the explanation provided was far from reasoned, as it failed to address any of the contrary evidence. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 170-71 (6th Cir. 2003) ("[t]he mere possibility" of a particular conclusion, notwithstanding "overwhelming evidence to the contrary, is an insufficient basis upon which to support a plan administrator's decision to deny" a claim); *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005) (abuse of discretion when administrator relies on opinion of physician who fails to explain basis for rejecting other physicians' conclusions). Instead, MetLife supported its decision to rescind only by its cherry-picking symptoms from Conger's medical records, and then reverse-engineering a diagnosis. This is not the hallmark of a *reasoned* explanation. *Moon*, 405 F.3d at 381 (requiring a reasoned explanation "consistent with the quantity and quality of the medical evidence" (internal quotation omitted)). For these reasons, we conclude that MetLife abused its discretion by concluding that Conger's answer to Question 5 was inaccurate, and MetLife's claim for rescission fails.

Although the foregoing, by itself, reveals that MetLife's rescission was arbitrary and capricious, we note that MetLife's conflict of interest further supports this conclusion. In the related context of ERISA cases, we have noted that "courts must be aware of a possible conflict of interest and consider it as a factor in determining whether the decision to deny benefits was arbitrary and capricious." *Gismondi*, 408 F.3d at 298. A situation in which the party paying the benefits also decides whether to pay involves "an actual, readily apparent conflict." *Id.* (quoting *Killian*, 152 F.3d at 521).

Here, such a conflict exists. LTCP, the administrator, is a joint venture between MetLife and another insurance company and was formed for the sole purpose of administering policies under the FLTCIP. Although the record regarding the ultimate corporate separateness of MetLife and LTCP is not well-developed, the record reveals that LTCP sought review of its dispute with Conger from a MetLife physician. Thus, an employee of the party paying the benefits also made the final decision regarding whether to pay the claim, and in such a situation, "we must view the explanation with some skepticism." *Moon*, 405 F.3d at 381-82; *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 507 (6th Cir. 2005) (same, quoting *Moon*).[3]

---

[3] The LTCP letter to Dr. Jackson raises further suspicions that MetLife's decision may have been motivated by its conflict of interest rather than a deliberate, principled reasoning process. In the letter, Mary Lou Asbell of LTCP states, "*We have a medical history since at least 1998 of progressive neurological disorder*, the cause of which was never actually diagnosed by the multiple doctors Mr. Conger went to." J.A. at 293 (emphasis added). After copying Question 5 and Conger's answer, Asbell concludes, "Legal is requesting a medical opinion as to if the medical record supports a 'Yes' answer to question 5 above." *Id.* Because the letter is phrased to suggest strongly the conclusion that LTCP wished to receive, we have further reason to believe that the decision was motivated by the conflict of interest.

## B. Declaratory Relief Claim—Material Misrepresentation

The district court took the unusual step of moving beyond arguments made in support of MetLife's motion for judgment on the administrative record and raising *sua sponte* the issue of whether Conger misrepresented a material fact by *failing to volunteer* information regarding his medical history. This issue coincides with MetLife's claim for a declaratory judgment, which was premised solely upon Conger's alleged "concealment and/or failure to disclose material facts regarding his medical condition," J.A. at 23-24, although the district court did not clearly indicate that it was addressing this claim. Ultimately, the district court concluded that Conger's failure to disclose "his symptoms and overall health condition" was a material misrepresentation justifying MetLife's decision to rescind. *Conger*, 396 F. Supp. 2d at 782.

Because MetLife did not raise Conger's alleged misrepresentation by omission as a reason for terminating his coverage (or as a basis for judgment on the administrative record), we are uncertain whether the district court properly raised this issue in deciding MetLife's motion for judgment on the administrative record. However, we need not address this issue because even if the district court acted within its discretion to raise the issue, Conger's failure to volunteer unrequested information did not justify MetLife's decision to terminate coverage.

In reviewing this decision, we apply the federal common law. The LTCSA contains a broad preemption clause. 5 U.S.C. § 9005(a). In the related arena of insurance plans governed by ERISA, which also broadly preempts state law, we have held that the federal common law determines the effect of a misrepresentation or omission in the insured's application for insurance. *Davies v. Centennial Life Ins. Co.*, 128 F.3d 934, 943 (6th Cir. 1997). We adopt the same approach for cases under the LTCSA.

The fatal flaw in the district court's reasoning is its failure to address whether Conger was under any duty to disclose his medical history. This issue is crucial, as we have already determined that MetLife has not shown that Conger answered incorrectly any of the questions MetLife asked, and the record does not indicate that MetLife required any information beyond these questions. It is black-letter law that "[a] party applying for insurance . . . generally has no duty where the application makes no specific inquiries." 6 COUCH ON INS. § 84:2 (3d ed. 2006). Even a case cited by MetLife explicitly recognizes that "an applicant is under no duty to volunteer information where no question plainly and directly requires it to be furnished." *Aetna Cas. & Sur. Co. v. Retail Local 906 of AFL-CIO Welfare Fund*, 921 F. Supp. 122, 132 (E.D.N.Y. 1996) (applying New York law and quoting *Vella v. Equitable Life Assurance Soc.*, 887 F.2d 388, 392 (2d Cir. 1989)). At least eight states follow the same principle. *See*, *e.g.*, *id.*, *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 48 F.3d 778, 780-81 (4th Cir. 1995) (Virginia law); *Cosby v. Transamerica Occidental Life Ins. Co.*, 860 F. Supp. 830, 833 (N.D. Ga. 1993) (Georgia law); COUCH § 84:2 n.10 (citing cases from Alabama, California, Georgia, Minnesota, Washington, and Wisconsin). The district court did not cite, and we were not able to find, a case applying federal common law that reached a contrary conclusion. Accordingly, we hold that under federal common law, applicants for insurance have no duty to disclose undiagnosed symptoms or medical history not specifically requested by an insurance company.[4]

---

[4] Were we to analyze this as a question of materiality, we would reach the same conclusion. As the Supreme Court noted long ago, information not requested by an insurer is presumptively not material to its coverage decision. *Stipcich v. Metro. Life Ins. Co.*, 277 U.S. 311, 316 (1928). Here, the only evidence in the record indicating that Conger's medical history was material are statements by the insurer made after it issued coverage and the dispute arose. We find such post-hoc evidence insufficient to overcome the presumption of immateriality. Were it otherwise, the presumption would be reduced to nothing, as any insurer could overcome it merely by filing an affidavit asserting that a certain piece of unrequested information was material and that no coverage would have been issued had it known of the information.

More concretely, an applicant for long-term care insurance who suffered a stroke within two years of the policy's issuance likely would not be covered under the district court's theory. Arterial blockage occurs over a long

## IV. CONCLUSION

For the reasons explained above, we hold that (1) MetLife abused its discretion by steadfastly adhering to its decision to rescind Conger's long-term care coverage while ignoring, without explanation, significant evidence contrary to its conclusion that Conger had a progressive neurological disorder when he applied for coverage; and (2) Conger had no independent duty to disclose information not requested by MetLife. Accordingly, we **REVERSE** the district court's judgment on the pleadings. We note that our first holding forecloses MetLife's claim for rescission, and our second holding forecloses its claim for declaratory judgment, so we **REMAND** with instructions to dismiss MetLife's complaint.

---

period of time, so the hypothetical insured certainly would have had some degree of artery disease at the time he applied. Under the reasoning of the district court, the insurer could rescind the policy and avoid paying any benefits merely by filing in the administrative record a declaration stating that it would not have offered the insurance if it had known of the applicant's then-existing artery blockage. The traditional rule—that the insurer must ask for the information it wishes to receive—offers a more reasonable alternative.