JANE B. STRANCH, Circuit Judge, dissenting. At issue in this ERISA case is whether AT&T Umbrella Plan No. 3 (the Plan) wrongfully denied Rebecca Filthaut’s claim for short-term disability benefits. My disagreement with the majority is primarily with the ultimate outcome in the case, not with the governing standards it employs. I concur with the majority’s rejection of the Plan’s repeated charge that our governing precedent, Shaw v. AT&T Umbrella Benefit Plan No. 1, 796 F.3d 538 (6th Cir. 2015), is “neither binding nor instructive.” The Plan’s contentions that Shaw conflicts with Supreme Court precedent and that compliance with Department of Labor regulations setting minimum standards establishes that, its claim determination cannot be arbitrary or capricious are simply disingenuous. The majority opinion rightly recognizes that we analyze a denial of disability benefits under the four-factor rubric laid out in Shaw. Because I disagree with the result it reaches after applying those factors, I respectfully dissent. I turn to application of Shaw’s four factors to the record. I. Ignoring favorable evidence from treating physicians The Plan claims to have denied Filthaut benefits for lack of objective medical documentation or findings to support her diagnosis of severe lower back pain. But when Filthaut furnished such objective documentation, the Plan either ignored the provided evidence or summarily rejected it without analysis. Thus, the Plan — the same plan that was sued in Shaw — once again “ignored favorable evidence from [the plaintiffs] treating physicians.” Shaw, 795 F.3d at 548. As the district court and the majority noted, in a March 3, 2014 exam, Fil-thaut’s treating physician, Dr. Carley, observed that Filthaut was “unable to ambulate,” listing “no work” as a functional restriction. (Maj. Op. at 678-79) Dr. Car-ley recommended that, if Filthaut was nonetheless required to work, necessary work accommodations would include breaks every five minutes; no sitting or standing for more than five to ten minutes; no lifting over two pounds; no reaching overhead; and no bending, twisting, kneeling, or stooping. All of the reviewing physicians — and, ultimately, the Plan — either ignored this evidence or categorically rejected it as unsupported by objective evidence. “[A] plan may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion.” Shaw, 795 F.3d at 548-49 (alteration in original) (quoting Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 620 (6th Cir. 2006)). The Plan claims, and the majority opinion appears to accept (Maj. Op. at 682-83), that the reviewing physicians discounted Dr. Carley’s findings because they were unsupported. But the Plan and the reviewing physicians ignored the specific medical evidence that provided the necessary support. For example, Dr. Grat-tan reviewed notes from physical therapy meetings while performing his file review. Those physical therapy notes indicate that Filthaut’s lumbar flexion was at “50%” in early February 2014 and at “75%” in early April, covering two of the claim time periods. Dr. Grattan does not analyze or even acknowledge the documented range of motion in his report. As to Filthaut’s kidney problems, Dr. Grattan’s report describes a CT scan from March 7, 2013, during the period in which Filthaut’s pain was returning, that showed a “hypodense structure ... in the upper right pole of the kidney” and “cystic density adjacent to the common bile duct ... [which] is of uncertain clinical significance.” Dr. Grattan, whose area of expertise is not in nephrolo-gy, might have been justified in declining to hypothesize about the nature of those structures. His failure t'o even acknowledge their possible import would be less concerning if the lone reviewing nephrologist had explained the medical significance of those findings — but Dr. Friedman did not even acknowledge the existence of the structures in his report. He merely stated, “CT of the abdomen dated 03/07/13 was reviewed,” and proceeded to his conclusion that there is “no evidence of functional impairment from the nephrology standpoint.” Finally, as the majority correctly notes (Maj. Op. at 682-83), two of the four reviewing physicians in the claims relevant to this appeal followed the precise procedure this court declared “unreasonable” in Shaw: “g[iving] the treating physicians only 24 hours to respond to their requests before they made their disability-decisions ‘based on available medical information.’ ” Shaw, 795 F.3d at 549. II. Selectively reviewing treating physician evidence “An administrator acts arbitrarily and capriciously when it ‘engages in a selective review of the administrative record to justify a decision to terminate coverage.’” Shaw, 795 F.3d at 549 (quoting Metro. Life Ins. Co. v. Conger, 474 F.3d 258, 265 (6th Cir. 2007)). Perhaps the most telling instance of selective review in this case is found in Dr. Xico Garcia’s synopsis of Dr. Curley’s treatment: “The patient states she is ready to go back to work and has not been able to go to physical therapy as much as she should be.” (emphasis added) Dr. Carley’s notes actually say, “P[atien]t-states she isn’t ready to go back yet— hasn’t been able to go to physical therapy as much as she should be.” (emphasis added) The majority discusses neither the clear error nor the problematic mischarac-terization because. Dr. Garcia’s examination occurred in the context of the denied Claim 1. But subsequent physicians indicated that they reviewed and may have relied upon prior reports. Dr. Moshe Lewis, for example, noted the negative conclusions of “Multiple reviewers throughout the year” in his rationale for denying Claim 3. Thus, this early misstatement of the record compounded the risk of error and contaminated the analyses of Claims 2 and 3. III. Failing to conduct its own physical evaluation The majority’s analysis of the third Shaw factor, the failure to conduct physical examinations, ably highlights the problematic credibility determinations the reviewing physicians undertook in this case. (Maj. Op. at 685) To that analysis, I would only add that, while the Plan may have had “no obligation to conduct an independent physical examination,” Maj. Op. at 684, this court has been clear that “the failure to conduct a physical examination, where the Plan document gave the plan administrator the right to do so, ‘raisefs] questions about the thoroughness and accuracy of the benefits determination.’” Shaw, 795 F.3d at 550 (alteration in original) (quoting Helfman v. GE Group Life Assurance Co., 573 F.3d 383, 393 (6th Cir. 2009)). IV. Heavily relying on physician consultants Neither the parties’ briefs nor the district court’s opinion analyzed the track records of any of the reviewing physicians other than Dr. Jamie Lee Lewis, the physician identified by name in Shaw as having been criticized “in numerous federal-cases.” Shaw, 785 F.3d at 551. But Dr. Lewis is not the only reviewing physician involved in this ease whose work has been criticized by the federal courts. Dr. Ran-gaswamy, for example, who appears to specialize in hand surgery, Smith v. Hartford Life & Accident, No. C 11-03495, 2013 WL 394185, at *5 (N.D. Cal. Jan. 30, 2013), has issued opinions that one federal court called “cursory,” McKoy v. Int'l Paper Co., 488 F.3d 221, 223 (4th Cir. 2007), and that another found failed to take into account relevant evidence, Smith, 2013 WL 394185, at *25. It is true that other cases have accepted the opinions of these doctors and that there is no magic number of negative decisions after which a reviewing physician is no longer credible. But where, as here, other Shaw factors have already created doubt about the reliability of the reviewing physicians’ work, it is troubling when a defendant continues to rely on physicians who are “repeatedly retained by benefits plans,” Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), and whose work for those plans has also been criticized by the federal courts. In sum, on the record before us, I think Filthaut has shown that the four Shaw factors, considered, in their entirety, counsel in favor of finding the Plan’s decision to deny disability benefits arbitrary and capricious. I therefore respectfully dissent.