**Thomas SMITH, Plaintiff,**

v.

**COLUMBIA GAS OF OHIO GROUP MEDICAL BENEFIT PLAN, et al., Defendants.**

**Case No. 2:06–cv–00708.**

United States District Court,
S.D. Ohio,
Eastern Division.

June 4, 2009.

Michael E. Heffernan, Allotta Farley & Widman CO, LPA, Toledo, OH, for Plaintiff.

Diane Catherine Reichwein, Greg M. Daugherty, Robert J. Stalter, Porter Wright Morris & Arthur LLP, Adele Ellen O'Conner, NiSource Services Company, Jenny L. Higgins, Columbia Gas, Columbus, OH, for Defendants.

### OPINION AND ORDER

GEORGE C. SMITH, District Judge.

Plaintiff, Thomas Smith ("Smith"), filed this action against Defendants Columbia Gas of Ohio ("Columbia Gas" or "the company"), the NiSource Consolidated Flex Medical Plan ("Medical Plan"), the NiSource Dental Plan ("Dental Plan"), the NiSource Vision Plan ("Vision Plan"), the NiSource Life Insurance Plan ("Life Insurance Plan"), and the Retirement Plan of Columbia Energy Group Companies ("Pension Plan") (collectively, "Defendants"), asserting five claims under the Employee Retirement Income Security Act of 1974 ("ERISA"). This matter is before the Court on Plaintiff's Motion for Judgment on the Merits or, in the alternative, a Motion for Summary Judgment (Doc. 48). In addition, Defendants have filed a Motion for Summary Judgment (Doc. 50). For the following reasons, Plaintiff's Motion for Judgment on the Merits and/or Summary Judgment (Doc. 48) is **GRANTED in part and DENIED in part** as specified herein, and Defendants' Motion for Summary Judgment (Doc. 50) is **GRANTED in part and DENIED in part** as specified herein.

### I. FACTUAL BACKGROUND

#### A. Plaintiff Smith

Plaintiff Smith graduated from high school in 1970. He thereafter served in the United States Army. He saw combat duty in Vietnam where he was shot in both legs, his arm and neck. Plaintiff began his employment with Columbia Gas (now NiSource) as a laborer in June 1977. By virtue of his employment at Columbia Gas, Plaintiff Smith was a participant in the Group Long–Term Disability Insurance Plan ("LTD Plan"), the Medical Plan, the Dental Plan, the Vision Plan, the Life Insurance Plan (collectively the "Welfare Plans") and the Pension Plan.

Beginning in July 1993, Plaintiff Smith began to experience periodic dizziness, falling down and passing out. The last day Plaintiff provided service to the company was July 7, 1993. On or about December 22, 1993, Plaintiff Smith filed a claim for disability to the LTD Plan's administrator, Aetna Life Insurance Company ("Aetna"). On January 28, 1994, Aetna granted Plaintiff's claim for long-term disability benefits and began paying a monthly benefit under the LTD Plan effective January 7, 1994. In addition, the Social Security Administration awarded Plaintiff Smith disability benefits effective January 1994.

## B. Aetna's Termination of Plaintiff Smith's Disability Benefits & Plaintiff Smith's Appeal

Aetna continued to pay Plaintiff Smith's disability benefits for more than seven years. Then, on February 20, 2001, Aetna terminated benefits to the Plaintiff effective February 28, 2001. Aetna advised Columbia Gas that Plaintiff's "LTD benefits have been terminated as of February 28, 2001, because he no longer meets that policy definition of *disability*."

Plaintiff internally appealed the termination of his disability benefits, and Aetna wrote to Plaintiff on September 11, 2001, advising that it had upheld the decision to terminate. Thereafter, on October 15, 2002, Plaintiff brought an action in this Court pursuant to 29 U.S.C. § 1132, seeking judicial review of Aetna's termination of disability benefits. (*See Smith v. Aetna U.S. Healthcare,* 312 F.Supp.2d 942 (S.D.Ohio 2004)) (Sargus, J.). At that time, Plaintiff Smith continued to be billed for and receive his Medical, Dental, Vision, and Life Insurance benefits, and Plaintiff Smith was not notified that he was no longer earning credited service under the Pension Plan.

On March 24, 2004, this Court rendered its decision on the parties' cross motions for judgment in the action filed against Aetna. *See Smith v. Aetna U.S. Healthcare,* 312 F.Supp.2d 942 (S.D.Ohio 2004) (Sargus, J.). The Court reversed Aetna's determination and reinstated Plaintiff Smith's benefits under the LTD Plan. *Id.* In reaching this conclusion, Judge Sargus stated:

In summary, Dr. Held and Dr. Nichols have treated Mr. Smith for over a decade. Both have described his longstanding problem with syncopal episodes. The episodes are documented by Tilt test results which reveal the presence of the condition. Since January of 1994, Aetna has agreed with such conclusions and has paid benefits to the Plaintiff. Further, the Social Security Administration determined that Smith was entitled to disability benefits from the same date and continues to pay such payments due him based upon total disability.

Notwithstanding such evidence, Aetna has now concluded that the syncopal episodes do not prevent Smith from gainful employment. This conclusion is in contrast to all of the treating physicians who have issued opinions of record. The two nonexamining physicians who reviewed this case at Aetna's request have pointed to no objective test results or other medical documentation which would refute the conclusions reached by Dr. Held and Dr. Nichols. While this Court is not bound to accept an undocumented conclusion of a treating physician, it may also place little weight upon a conclusory opinion rendered by a non-examining physician who offers no medical evidence, or other justification while contradicting the medically supported conclusions of two treating physicians. Moreover, the most recent Tilt report, which neither Dr. Stevens nor Dr. Abbott reviewed, shows that Smith suffers from syncope. No evidence has been presented to demonstrate any significant change in condition which would warrant a termination of benefits.

Based upon the foregoing, the Court concludes that the Defendant Plan Administrator wrongfully terminated long term benefits payable to Smith by the terms of the Plan.

*Id.* at 953–54. The Court ordered that "Aetna shall reinstate disability benefits consistent with this Order." *Id.* at 954.

After this Court reinstated Mr. Smith's benefits, on June 2, 2004, Plaintiff Smith

entered into a confidential Settlement Agreement and Release of All Claims ("Settlement Agreement") with Aetna and the LTD Plan. In the parties' confidential settlement agreement, Plaintiff Smith agreed to accept a lump sum payment to resolve all of his claims. The agreement explicitly stated: "This Agreement does not constitute an admission of liability by Defendants, all liability being expressly denied." The Defendants in the instant case were not parties to the litigation or the Settlement Agreement. In addition, the Defendants in the instant case did not obtain a copy of the confidential Settlement Agreement until the discovery phase of this action. At the time Plaintiff Smith entered into the Settlement Agreement, he still continued to pay for and receive his Medical, Dental, Vision, and Life Insurance benefits, and he was never notified that he was no longer earning credited service under the Pension Plan.

## C. The NiSource Cleanup, Defendants' Termination of Plaintiff Smith's Benefits and Pension Plan

In 2005, Debbie Rock, the NiSource Employee Services Representative, began a project she labeled the "PeopleSoft Cleanup Project." "PeopleSoft" is the program by which NiSource keeps its employee records. The PeopleSoft Cleanup Project was undertaken in order to "remove people who were no longer on LTD benefits from receiving health and welfare benefits." (Rock Depo. at 23).

To complete this task, Ms. Rock would utilize quarterly reports from Aetna indicating who was "currently receiving LTD benefits, who had been dropped from benefits, anybody who retired and would no longer be receiving benefits." (*Id.* at 11 and Ex. 11). Ms. Rock testified that employees should be removed from LTD status on PeopleSoft and have their health

and welfare and retirement benefits suspended "[w]hen they [are] no longer with the carrier receiving benefits." (*Id.* at 28). She further noted that employees should be removed from LTD Status when their appeal of a long-term disability termination was denied by the insurance carrier. (*Id.* at 28–29). Approximately 60–63 individuals were affected by Ms. Rock's PeopleSoft Cleanup Project. (*Id.* at 26).

### 1. The Cleanup Project and Plan Participants Rose, Belair, Parisi, Timm and Osburn

During the course of the Cleanup Project, Ms. Rock received an email from Martha Cotton regarding questions made by plan participant Carl Rose. Mr. Rose took a lump sum settlement from Aetna and his claim was closed as of August 30, 2001. Ms. Rock advised that Mr. Rose "should have been termed in P/S; however that didn't happen." (*Id.* at Ex. 16). Ms. Rock subsequently received an copy of a letter that her predecessor had sent to Mr. Rose. That letter advised, "This letter represents written confirmation that if you do accept the lump sum payment by Aetna that you will remain eligible for benefits with Columbia Energy Group as if you had continued to receive LTD benefits. However, your eligibility to be covered under those benefit plans require that you continue to meet any eligibility criteria of the Columbia Energy Group LTD plan." (*Id.*).

Ms. Rock also received an email from Eva Kluga, a Benefits Specialist for NiSource, regarding the continued benefits of plan participants David Belair, Joseph Parisi and Marilyn Timm. The email indicated that the plan benefits of these individuals should not be terminated because the "LTD carrier, Standard, closed their account only due to the fact that the participant(s) is receiving monies from addi-

tional sources which exceeds the maximum benefit payable under the LTD policy in place. This policy did not contain a minimum payment clause, therefore, the carrier closed their claims. Due to this fact, the carrier would not be following up to ensure that they should remain in a LTD capacity, we cannot decide if they should remain in a LTD status and I am sure that your end would not be able to do so as well." (*Id.* at Ex. 9). After receipt of the foregoing email, Ms. Rock sent an email indicating that "it was decided that the above 3 [Belair, Parisi and Timm] should remain in P/S as LTD (so their Health and Welfare benefits continue)." (*Id.*).

Finally, Ms. Rock received a letter from plan participant Doretta Osburn's attorney. The attorney advised that Ms. Osburn received a lump sum payment of her disability benefits and requested that her other benefits be continued. Enclosed was a letter from Suzie Ingram of "Columbia Natural Resources A NiSource Company" stating, "We did confirm that if Ms. Osburn does accept the lump sum payment by Aetna, she would remain eligible for benefits with Columbia Natural Resources as if she had continued to receive LTD benefits. However, her eligibility to be covered under those benefit plans would require that she continue to meet any eligibility criteria of our LTD plan." (*Id.* at Ex. 15).

### 2. The Cleanup Project and Plaintiff Smith

During the Cleanup Project, Ms. Rock reviewed Plaintiff Smith's file and made notes. On April 5, 2005, Ms. Rock noted that Mr. Smith had been billed for his continuing medical and dental coverage since January 1, 1998. (*Id.* at 36). She further noted that Aetna had terminated his disability benefits February 28, 2001. (*Id.* at 37).

On August 3, 2005, Ms. Kluga emailed an excel spreadsheet to NiSource personnel instructing:

Attached please find an excel spreadsheet with respect to several of our participants, broken down by company, that should have been removed from their LTD status or will be expecting to be removed from their LTD status shortly. The reason for this email is to inform you of our intention that we do not want any back billing for COBRA premiums. For example, if the time period has already expired, just term their medical as soon as possible.

(Aronson Depo. at 35, Ex. 3). Ms. Rock testified that NiSource did not want back billing because "the status could have been changed sooner and was not so it was a decision made not to back bill employees if they were still eligible." (Rock Depo. at 30). On August 4, 2005, Ms. Rock sent an email to Jim Brown, NiSource HR Director, indicating: "Attached is a list of employees who currently have a People-Soft status of LTD; however, according to the LTD provider, they no longer have an active LTD claim and they are not receiving LTD benefits." (Aronson Depo. at 35, Ex. 3). She directed the HR Department to "notify the employee if their Company status changes." (*Id.*).

On or about September 1, 2005, Plaintiff Smith received a letter from Columbia Gas of Ohio notifying him that he had been "administratively separated retroactively to February 21, 2001." (Smith Depo. at 25, Ex. A). The letter was sent from Lynne Aronson, a Senior Consultant in HR with Columbia Gas. The letter was similar to a form letter that was sent out to all individuals affected by the People-Soft Cleanup Project.

On September 16, 2005, NiSource sent Plaintiff Smith a letter advising him that he had accumulated 24.8333 years of Bene-

fit Service under the Pension Plan, with credited service ending February 27, 2001. Plaintiff subsequently received communications from NiSource indicating that his Medical, Dental, Vision, Life, Accidental Death and Dismemberment Benefits had terminated effective August 31, 2005. These letters did not indicate the reason for Plaintiff's termination of benefits nor did they reference the plan provisions on which the determination to terminate was based. Further, the communications did not set forth any review procedures or inform Plaintiff Smith of his right to bring a civil action under ERISA.

On October 26, 2005, Plaintiff Smith's counsel wrote to Columbia Gas to request reconsideration of the decision to terminate Plaintiff's pension credited service and welfare benefits. On October 31, 2005, counsel for NiSource replied that the matter was under consideration and would be responded to as soon as practicable. On December 13, 2005, Plaintiff's counsel sent a letter to NiSource counsel requesting an answer to the request for reconsideration. And, again on February 7, 2006, Plaintiff's counsel sent a letter to NiSource counsel requesting that the appeal be heard.

On February 25, 2006, after Plaintiff's Accidental Death and Dismemberment Benefits were terminated, his son died in a automobile accident. His son was listed as an insured under the Accidental Death and Dismemberment Plan with a death benefit of $10,000.

### D. The Plan Documents

#### 1. 1994 Long–Term Disability Plan

The Long Term Disability Plan was with Aetna Life Insurance. The insurance policy provided that "it will pay a Monthly Benefit for a period of total disability caused by a disease or accidental bodily injury." The LTD Plan defined "Total Disability" as follows:

You are deemed to be totally disabled while you are not able, solely because of injury or disease, to work at your own occupation, or at any reasonable occupation. (This is any gainful activity for which you are, or may reasonably become, fitted by education, training or experience. It does not include work under an approved rehabilitation program.).

Absent recovery, the total disability benefits end at age 65.

#### 2. Welfare Plans

While Plaintiff Smith was performing services for Columbia Gas, he was eligible to participate in the company's Welfare Plans, including the Medical Plan, Dental Plan, Vision Plan and Life Insurance Plans.

The Medical and Dental Plans in effect at the time Plaintiff Smith's medical benefits were terminated provides as follows:

(a) An Employee shall cease to participate in the Plan on the earliest of the following dates:

(1) The date as of which the Plan is terminated;

(2) The date the Plan is amended to terminate coverage with respect to an Employee;

(3) The date an Employee is no longer eligible for coverage under Article III;

(4) The date an Employee commences active duty in the armed forces, except to the extent continuation coverage is required pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994 and except as provided in the NiSource Military Leave of Absence Policy;

(5) The last date for which any required Covered Person Contribution was made;

(6) The last date on which a leave of absence begins, except to the extent continuation coverage is required under Section 22.02 (relating to coverage required by the FMLA); or

(7) The end of the month following the date an Employer terminates employment, unless the Employee elects coverage as a Retiree prior to his or her retirement.

\* \* \*

(Medical Plan at Section 22.01, Dental Plan at Section 14.01). The foregoing provisions of the Medical and Dental Plans were amended effective January 1, 2006 to add an eighth subsection stating, "(8) The date on which an Employee receives a lump-sum benefit under an Employer's long-term disability plan."

The Life Insurance Plan provides as follows:

**10.1 Cessation of Participation.** Except as otherwise provided in this Article:

(a) An Employee shall cease to participate in the Plan on the earliest of the following dates:

(i) The date as of which the Plan is terminated;

(ii) The date that the Plan is amended to terminate coverage with respect to an Employee;

(iii) The end of the month following the date an Employee is no longer eligible for coverage under Section 3.1;

(iv) The last date for which any required Covered Person Contribution was made; and

(v) The date provided for coverage termination in the Applicable SPD.

(Life Insurance Plan at Section 10.1).

The Vision Plan provides as follows:

**11.01 Cessation of Participation.** Except as otherwise provided in this Article:

(a) An Employee shall cease to participate in the Plan on the earliest of the following dates:

(1) The date as of which the Plan is terminated;

(2) The date that the Plan is amended to terminate coverage with respect to an Employee;

(3) The end of the month following the date an Employee is no longer eligible for coverage under Section 3.01;

(4) The date an Employee commences active duty in the armed forces, except to the extent continuation coverage is required pursuant to the Uniformed Services Employment and Reemployment rights Act of 1994, except as provided under the NiSource Inc. Military Leave Policy;

(5) The last date for which any required Covered Person Contribution was made;

(6) The date on which a leave of absence begins, except to the extent continuation coverage is required under Section 11.02 (relating to coverage required by the Family and Medical Leave Act of 1993);

(7) The end of the month following the date an Employee terminates employment; and

(8) The date provided for coverage termination in the Applicable SPD.

(Vision Plan at Section 11.01).

The Life Insurance Plan and the Vision Plan define "Applicable SPD" as "the sum-

mary plan description applicable to the group of Employees, Retirees or Dependents, to which a Covered Person belongs. Each Applicable SPD shall be considered a part of the Plan and shall be consistent with the group insurance policy or policies that fund Plan benefits." (Life Insurance Plan at Section 2.2; Vision Plan at Section 2.02).

In a section titled "Long–Term Disability and Your Other Columbia Benefits" of The Summary Plan Description ("SPD") released in 2000 and in effect at the time Plaintiff Smith settled with Aetna, the SPD states: "Your medical, EAP and dental benefits and your life insurance coverage continue while you're receiving LTD benefits." The 2005 Health and Welfare Benefits Handbook Summary Plan Descriptions ("2005 SPD") provides:

> Generally, the Medical Coverage is only available to you if you are actively at work. However, there are certain leaves during which you can continue your coverage. They are:
>
> * * *
>
> **Long Term Disability Leave**—Medical coverage for you and your eligible dependants continue while you are receiving LTD benefits or if an appeal is pending in accordance with the Plan provisions. You must continue to make your required contribution.
>
> * * *

(2005 SPD at 55).

With respect to administration of the Medical Plan, Section 20.01 indicates that NiSource is the "Named Fiduciary" and "Plan Administrator." Section 20.04 provides:

> The Plan Administrator has the full and final authority to decide all questions or controversies of whatever character arising in any manner between any parties or persons in connection with the Plan or the interpretation thereof, including, without limitation, the construction of the language of the Plan and the Summary Plan Description thereunder. Any writing, decision, determination of benefit eligibility or any other determination or instrument created by the Plan Administrator in connection with the operation of the Plan shall be binding upon all persons dealing with the Plan or claiming any benefits thereunder, except to the extent that the Plan Administrator may subsequently determine, in its sole discretion, that its original decision was in error, or to the extent such decision may be determined to be arbitrary or capricious by a court or other entity having jurisdiction over such matters. Benefits under the Plan shall be paid only if the Plan Administrator decides in its discretion that the applicant is entitled to them.

(Medical Plan at Section 20.04). The Medical Plan further provides:

> The Plan Administrator shall have the duties and powers necessary to administer the Plan properly, including, but not limited to, the following:
>
> * * *
>
> (e) To interpret the Plan, construe Plan terms and decide questions and disputes, which interpretations, constructions and decisions shall be conclusive for all purposes of the Plan[.]
>
> * * *

(Medical Plan at Section 20.03). The other Welfare Plans contain the same or similar provisions. (*See* Dental Plan at Sections 12.03 and 12.04; Vision Plan at Sections 9.03 and 9.04; and Life Insurance Plan at Sections 8.3(e) and 8.4).

### 3. Pension Plan

The Pension Plan, as amended and restated effective August 19, 1998, defines "Participant" to mean "any Employee of

the Employer who has met the eligibility and participation requirements of the Plan." (Pension Plan at Section 2.24).

The amount of a Participant's pension benefit under the Pension Plan is calculated in part based upon "Credited Service", which is defined in the Retirement Plan as "a Participant's Service under the Plan ..." (Pension Plan at Section 2.12). "Service" is then defined as:

an Employee's period of employment with the Company or any Affiliated or Predecessor Company, whether or not continuous, commencing on his Employment Date or Reemployment Date, whichever is applicable, and ending on his Severance Date, and will be subject to the following rules:

* * *

(c) Service will include absence because of illness or disability during which the Employee is eligible for benefits under the Company's Long Term Disability Plan, *but only to the extent provided in Article 8.*

(Pension Plan at Section 2.33) (emphasis added).

Article 8 of the Pension Plan is titled "Long Term Disability Plan Participants." Section 8.2 is titled "Eligibility for Retirement Income" and provides:

This Article will only apply to:

(a) a former employee who, after the cessation of receipt of disability benefits under the Long Term Disability Plan, either returns (or returned) to the employ of an Employer or elects (or elected) to retire, or,

(b) a former Employee who, while receiving Long Term Disability Plan benefits, retires and whose eligibility to receive these benefits under the Long Term Disability Plan commenced on or after July 1, 1968, or

(c) any individual who was formerly employed by an Employer, who began receiving Long Term Disability Plan benefits before qualifying as a Participant hereunder by reason of his length of employment or by reason of the fact that he had not attained his 21st birthday, and who either returns (or returned) to the employ of an Employer or elects (or elected) retirement while receiving Long Term Disability Plan benefits.

(Pension Plan at Section 8.2).

Section 8.3, titled "Credit Toward Plan Benefits" provides:

A former Employee *eligible under this Article 8* will receive Credited Service equal to the period for which he is eligible for benefits under the Long Term Disability Plan.

(a) A former Employee who does not return to the employ of an Employer will be deemed to have received Compensation for the period for which he is eligible for benefits under the Long Term Disability Plan at the rate in effect for him at the time his disability commenced and his Final Average Annual Compensation will be calculated as of his actual retirement date; or

(b) A former Employee who returns to the employ of an Employer still have his Final Average Annual Compensation determined by considering employment prior to disability and employment subsequent to disability as consecutive months of employment; provided, that during such periods he continuously is eligible for and receives disability benefits under the Social Security Act. An Employee who is absent because of a disability becomes a former Employee on the date he first becomes eligible for benefits

under the Long Term Disability Plan. An individual who is eligible under Section 8.2(c) will also receive Credited Service in accordance with the foregoing for the period for which he is eligible for benefits under the Long Term Disability Plan.

(Pension Plan at Section 8.3) (emphasis added).

The 2000 SPD, which was in effect at the time Plaintiff Smith settled with Aetna, provides: "[i]n general, you receive credited service during the time you are employed by Columbia as a participant in the plan." (2000 SPD at 5). It further states, "If you qualify for benefits under the LTD plan ... you continue to earn vesting service, credited service and age and service points *during your disability.*" (*Id.* at 100) (emphasis added). In another section of the SPD, under the heading "Long–Term Disability and Your Other Columbia Benefits" the SPD states: "While you're disabled, you continue to earn service under the Retirement Plan." (*Id.* at 81). The SPD then sets forth a listing of what are not covered disabilities. (*Id.* at 81). Ni-Source Senior Consultant in Human Resources, Lynne Aronson, testified that the SPD language meant that "once you qualify for benefits under the LTD plan, you continue with credited service while you remain disabled." (Aronson Depo. at 78–79).

With respect to plan administration, the Pension Plan establishes a Retirement Board, which "shall be the named fiduciary and Plan administrator." (Pension Plan at Section 12.1). The Plan sets forth the "Duties of the Retirement Board" as follows:

The Retirement Board will have the general responsibility for administering the Plan and carrying out its provisions, including, but not limited to the following:

(a) Subject to the limitations of the Plan, the Retirement Board from time to time will establish rules for the administration of the Plan and the transaction of its business. As to all matters of administration, except those reserved to the Board or the boards of directors of the Employers the determination of the Retirement Board as to any disputed question will be conclusive.

* * *

(Section 12.4).

The Pension Plan sets forth procedures to be followed for claim denials:

*Benefit Claims Procedures.* In the event of denial of a claim made by a Participant, Pensioner, Spouse, child or Contingent Annuitant as to any distribution and/or the method of payment under the Plan, such Participant, Pensioner, Spouse, Child or Contingent Annuitant will be given 60 days notice in writing of such denial, which notice will set forth the reason for the denial. The Participant, Pensioner, Spouse, Child or Contingent Annuitant may request a review of such denial by filing notice in writing with the Retirement Board. The Retirement Board, in its discretion, may request a meeting to clarify any matters they deem appropriate. All interpretations, determinations, and decisions of the Retirement Board in respect to any matter hereunder will be final, conclusive, and binding upon the Employers, Participants, Pensioners, Spouses, Children or Contingent Annuitants and all other persons claiming any interest in the Plan.

(Section 12.8).

The Pension Plan calls for "Uniform Administration": "Whenever in the administration of the Plan any action is required of the Retirement Board with respect to

the eligibility or classification of any individual, or the eligibility for or nature of benefits to be provided hereunder, such action will be uniform in nature as applied to all persons similarly situated." (Pension Plan at Section 15.1).

### E. The Instant Action

On August 17, 2006, Plaintiff Smith's counsel filed the instant action after receiving no response to his requests for reconsideration. On January 30, 2007, Plaintiff Smith amended his Complaint. (Doc. 16). Plaintiff alleges that Defendants failed to substantially comply with ERISA regulations mandating that Plaintiff Smith be provided a full and fair review of the adverse benefit determination pursuant to 29 U.S.C. § 1133. (*See generally* Am. Compl.). In addition, Plaintiff contends that Defendants' wrongful termination of benefits should be reversed, asserting a claim for wrongful denial of benefits under 29 U.S.C. § 1132(a)(1)(B) or alternatively, a claim for estoppel under 29 U.S.C. § 1132(a)(3). (*Id.*). Finally, Plaintiff Smith has asserted a breach of fiduciary duty claim pursuant to 29 U.S.C. § 1132(a)(3) as an alternative to his wrongful denial of benefits and estoppel claims. (*Id.*).

On July 1, 2008, Plaintiff Smith filed a Motion for Judgment on the Merits or, in the alternative, a Motion for Summary Judgment (Doc. 48), and Defendant filed a Motion for Summary Judgment (Doc. 50). Both motions have been fully briefed and are ripe for review.

### II. STANDARD OF REVIEW

Defendants captioned their motion as one for "summary judgment" (Doc. 50) and relied upon the summary judgment standards. (Defs.' Mot. for Summ. J. at 1, 11). Defendants ask this Court to enter summary judgment in their favor on each claim alleged in Plaintiff's Amended Complaint, arguing that there are no genuine issues of material fact, and that Defendants are entitled to judgment as a matter of law.

Plaintiff Smith captioned his motion as one for "judgment on the merits" or in the alternative, one for "summary judgment" (Doc. 48). Plaintiff Smith, however, does not cite to the summary judgment standard, but instead relies on the authority of *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir.1998). In *Wilkins*, the Sixth Circuit held that summary judgment is generally not an appropriate mechanism for adjudicating ERISA claims for benefits. 150 F.3d at 617–19. Instead, judgment should be confined to the evidence contained only in the administrative record. *Id. See also University Hospitals of Cleveland v. Emerson Elec.*, 202 F.3d 839, 845 n. 2 (6th Cir.2000).

This case is unique in that there is no official administrative record. The reason that there is no official administrative record is because Defendants did not entertain Plaintiff Smith's appeals to his termination of benefits. Defendants' refusal to do so is based upon their contention that the termination of Plaintiff Smith's benefits was a ministerial action rather than an ERISA fiduciary function. Defendants opine that the termination was ministerial because the plan documents unambiguously required the termination of Plaintiff Smith's benefits.[1] Thus, the unofficial administrative record consists only of the

---

**1.** For the reasons set forth below (*see* discussion *infra* at Section III.A.1.), the Court disagrees with Defendants' contention that the termination was purely ministerial. Consequently, the Court continues its discussion on the appropriate standard to apply to its review of Defendants' decision to terminate Plaintiff's benefits.

plan documents and the correspondence exchanged between the parties.

■ With respect to this Court's review of Defendants' decision to terminate Plaintiff Smith's benefits, Defendants contend that the arbitrary and capricious standard of review should be applied in the instant case because the language in the Plans "clearly confers discretion on the plan administrators." (Defs.' Mot. for Summ. J. at 14–15). Plaintiff Smith, on the other hand, argues that the standard of review should be *de novo* "regardless of whether there exists discretionary authority under the plan documents" because "there was a lack of any procedural safeguards implemented in this case or an appeal heard." (Pl.'s Mot. for Summ. J. at 21). Plaintiff relies on *Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839 (6th Cir.2000) to support his argument. (*Id.*).

■ Courts review plan administrator's construction of plan terms under § 1132(a)(1)(B) *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *McCartha v. National City Corp.*, 419 F.3d 437, 441 (6th Cir.2005) (*citing Firestone*, 489 U.S. at 115, 109 S.Ct. 948). When a plan affords discretion to an administrator or fiduciary, the arbitrary and capricious standard of review applies. *McCartha*, 419 F.3d at 441 (*citing Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 456 (6th Cir.2003)); *Firestone*, 489 U.S. at 115, 109 S.Ct. 948.

In the instant case, the Medical Plan clearly vests discretionary authority with NiSource, who is the plan administrator:

The Plan Administrator has the full and final authority to decide all questions or controversies of whatever character arising in any manner between any parties or persons in connection with the Plan or the interpretation thereof, including, without limitation, the construction of the language of the Plan and the Summary Plan Description thereunder. Any writing, decision, determination of benefit eligibility or any other determination or instrument created by the Plan Administrator in connection with the operation of the Plan shall be binding upon all persons dealing with the Plan or claiming any benefits thereunder, except to the extent that the Plan Administrator may subsequently determine, in its sole discretion, that its original decision was in error, or to the extent such decision may be determined to be arbitrary or capricious by a court or other entity having jurisdiction over such matters. Benefits under the Plan shall be paid only if the Plan Administrator decides in its discretion that the applicant is entitled to them.

(Medical Plan at Section 20.04). The Medical Plan further provides:

The Plan Administrator shall have the duties and powers necessary to administer the Plan properly, including, but not limited to, the following:

\* \* \*

(e) To interpret the Plan, construe Plan terms and decide questions and disputes, which interpretations, constructions and decisions shall be conclusive for all purposes of the Plan[.]

\* \* \*

(Medical Plan at Section 20.03). The other Welfare Plans contain the same or similar provisions, and therefore, the Court finds that the other Welfare Plans also vest discretion with the plan administrator. (*See* Dental Plan at Sections 12.03 and 12.04; Vision Plan at Sections 9.03 and 9.04; and Life Insurance Plan at Sections 8.3(e) and 8.4).

Likewise, the Pension plan clearly vests discretion with the Retirement Board, who is the plan administrator:

> The Retirement Board will have the general responsibility for administering the Plan and carrying out its provisions, including, but not limited to the following:
>
>> (a) Subject to the limitations of the Plan, the Retirement Board from time to time will establish rules for the administration of the Plan and the transaction of its business. As to all matters of administration, except those reserved to the Board or the boards of directors of the Employers the determination of the Retirement Board as to any disputed question will be conclusive.
>
> * * *

(Pension Plan at Section 12.4). The Retirement Board, however, is required to exercise its discretion uniformly. (Pension Plan at Section 15.1).

Thus, because each of the plans clearly afford discretion to the plan administrator, the Court agrees with Defendants that the arbitrary and capricious standard of review applies. *See McCartha*, 419 F.3d at 441. *Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, does not, as Plaintiff Smith suggests, alter this conclusion. In a footnote containing dicta, the *Univ. Hosp. of Cleveland* Court opined that in a case where a plan administrator fails to timely decide an appeal, the claim would be deemed denied pursuant to 29 C.F.R. § 2560.503–1(h)(4), and in such a circumstance, "there is undeniable logic in the view that a plan administrator should forfeit deferential review by failing to exercise its discretion in a timely manner." *Univ. Hosp. of Cleveland*, 202 F.3d at 846 n. 3. Immediately following this statement, however, the *Univ. Hosp. of Cleveland* Court noted that the Sixth Circuit has already passed on

this issue and concluded that "the standard of review is no different whether the appeal is actually denied or is deemed denied." *Id.* (*quoting Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir.1988) *cert. denied*, 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988)). Because *Daniel* is still the controlling law on this issue, the correct legal standard to apply to Defendants' termination of Plaintiff Smith's benefits is the arbitrary and capricious standard of review.

 The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. *McDonald v. Western–Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir.2003). Under the arbitrary and capricious standard, a determination by the plan administrator will be upheld if it is rational in light of the plan's provisions. *Id.*; *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir.1996). When it is possible to offer a reasoned explanation for a plan administrator's decision based upon the evidence, that decision is not arbitrary and capricious. *McDonald*, 347 F.3d at 169; *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir.1989). The arbitrary and capricious standard, however, "does not require us merely to rubber stamp the administrator's decision." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir.2004) (citation omitted). The Court is "entitled to take into account the existence of a conflict of interest that results when ... the plan administrator who decides whether an employee is eligible for benefits is also obligated to pay those benefits ...." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir.2006). Moreover, the Sixth Circuit has instructed: "to the extent that the [Plans'] language is susceptible of more than one interpretation, [a court should] apply the 'rule of *contra proferentum*' and construe any ambiguities against

... the drafting parties." *Univ. Hosp. of Cleveland,* 202 F.3d at 846–47 (*citing Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 557 n. 7 (6th Cir.1998)).

▪ Although the arbitrary and capricious standard applies to Defendants' termination of Plaintiff Smith's benefits, with respect to Plaintiff Smith's 29 U.S.C. § 1133 claim, the appropriate standard of review is *de novo. See e.g., Wenner v. Sun Life Assurance Company of Canada,* 482 F.3d 878, 881 (2007) ("[T]his Court reviews *de novo* the legal question whether Sun Life in denying Wenner's claim complied with the notice requirements of ERISA." (citations omitted)); *McCartha,* 419 F.3d at 444 (*citing Kent v. United Omaha Life Ins. Co.,* 96 F.3d 803, 806 (6th Cir.1996)).

## III. DISCUSSION

### A. Standing

As a threshold matter, this Court first addresses Defendants' contention that Plaintiff Smith cannot assert an ERISA cause of action under either 29 U.S.C. § 1132(a)(1)(B) or 29 U.S.C. § 1133.

#### 1. 29 U.S.C. § 1132(a)(1)(B)

▪ As a threshold matter, Defendants appear to argue that Plaintiff Smith's claim under 29 U.S.C. § 1132(a)(1)(B) fails because "he is no longer a participant in the Welfare Plans and is no longer an active participant in the Retirement Plan." (*See* Defs.' Mot. for Summ. J. at 12). Plaintiff Smith argues that as a former participant, he is entitled to assert a claim for wrongful denial of benefits under § 1132(a)(1)(B). (Pl.'s Memo. in Opp. at 10–11).

Neither party has cited to case law in support of their position.

Section 1132(a)(1)(B) provides:

(a) Persons empowered to bring a civil action

A civil action may be brought—

(1) by a *participant* or beneficiary—

\* \* \*

(B) to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

\* \* \*

29 U.S.C. § 1132(a)(1)(B) (emphasis added).

In *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that a former employee can be a participant if the employee either has "a reasonable expectation of returning to covered employment," or has a "colorable claim to vested benefits." *Id.* at 117, 109 S.Ct. 948 (internal quotations omitted). Because Plaintiff Smith does not allege that he will be returning to work, the issue centers on whether Plaintiff Smith, who is no longer a plan participant due to Defendants' termination of benefits, retains a "colorable claim to vested benefits." The *Firestone* Court explained that a "colorable claim" is a claim that the former employee will either "prevail in a suit for benefits" or "fulfill the eligibility requirements for benefits at some point in the future." *Id.* at 117–18, 109 S.Ct. 948.

In the instant case, Defendants argue that "Plaintiff has confused the concept of ministerial application of plan eligibility rules with a claim for benefits by an eligible participant." (Defs.' Mot. for Summ. J. at 12). Defendants contend that "[a]pplying plan eligibility rules in this case was a ministerial function, not an ERISA fiduciary function." (*Id.* at 13). Defendants explain:

In a dispute regarding the discontinuation of disability benefits, the question of whether an individual continues to remain disabled for purposes of continuation of benefits may require interpretation of plan terms and administrative discretion regarding facts presented. Here, however, Plaintiff's complaints revolve around a ministerial function. The plan provisions required that an individual's participation cease when the individual was no longer an employee receiving LTD plan benefits.

(*Id.*). Thus, Defendants liken the case to a typical ministerial situation where an employee's benefits are cut off after they quit or their employment is terminated. Defendants conclude that "[t]he ministerial function of adjusting records to reflect that Plaintiff was no longer eligible to participate in the Welfare Plans and Retirement Plan is not an action on which a claim under § 1132(a)(1)(B) can be based." (*Id.* at 12).

The Court disagrees with Defendants' conclusion because it rests upon a faulty premise. As set forth in Defendants' explanation, Defendants' conclusion is premised upon its contention that the decision to terminate Plaintiff Smith's benefits required no interpretation or administrative discretion because the plans unambiguously required that an individual's participation cease when the individual is no longer an employee or receiving LTD plan benefits. An argument can be made, however, that inclusion of such "receiving LTD benefits" language does not necessarily address a situation where an individual has accepted a lump sum payment. Indeed, as set forth in the fact section, the Medical and Dental Plans were amended effective January 1, 2006, to include a provision that would require termination of coverage on "[t]he date on which an Employee receives a lump-sum benefit under an Employer's long-term disability plan." Arguably, the language was added to "plug a hole" or to clear up ambiguity in the existing plan language.[2] Moreover, neither the Welfare Plans nor the Retirement Plan explicitly contain a receiving benefits requirement.[3]

The Medical and Dental Plan in effect at the time Plaintiff Smith's medical benefits were terminated set forth the circumstances under which an employee shall cease to be a plan participant, and there is nothing in that list that terminates coverage when an employee stops receiving LTD plan benefits.[4] (*See* Medical Plan at Section 22.01, Dental Plan at Section 14.01). Neither the Medical or Dental Plans reference the SPD.

Like the Medical and Dental Plans, the Life Insurance Plan and Vision plan also set forth circumstances under which an employee shall cease to be a plan participant, and again, neither plan explicitly contains a receiving benefits subsection. (*See* Life Insurance Plan at Section 10.1, Vision Plan at Section 11.01). Unlike the Medical

---

**2.** Plaintiff Smith has introduced evidence indicating that there were plan participants— Mr. Rose and Ms. Osburn—who accepted a lump sum payment of their LTD benefits from Aetna and who were informed by Defendants that they would remain eligible for benefits with Columbia Energy Group as if they had continued to receive LTD benefits.

**3.** Notably, Plaintiff Smith has introduced evidence indicating that there were plan participants—David Belair, Joseph Parisi and Marilyn Timm—who were not receiving LTD benefits, but whose health and welfare benefits were not terminated.

**4.** As noted above, the Medical and Dental Plans were amended effective January 1, 2006, to include a provision that would require termination of coverage on "[t]he date on which an Employee receives a lump-sum benefit under an Employer's long-term disability plan."

or Dental Plans, however, both the Life Insurance Plan and the Vision Plan reference the "Applicable SPD": "An employee shall cease to participate in the Plan on the earliest of the following dates: . . . (v) The date provided for coverage termination in the Applicable SPD." (Life Insurance Plan at Section 10.1(a)(v), *see also* Vision Plan at Section 11.01(a)(8) (same)). Both the Insurance and Vision Plans define "Applicable SPD" as "the summary plan description applicable to the group of Employees Retirees or Dependents, to which a Covered Person belongs. *Each Applicable SPD shall be considered a part of the Plan* and shall be consistent with the group insurance policy or policies that fund Plan benefits." (Life Insurance Plan at Section 2.2; Vision Plan at Section 2.02) (emphasis added). The 2000 SPD provides "Your medical, EAP and dental benefits and your life insurance coverage continue while you're *receiving LTD benefits.*" (2000 SPD) (emphasis added). Similarly, the 2005 SPD, provides:

> Generally, the Medical Coverage is only available to you if you are actively at work. However, there are certain leaves during which you can continue your coverage. They are:
>
> * * *
>
> **Long Term Disability Leave**—Medical coverage for you and your eligible dependants continue while you are *receiving LTD benefits* or if an appeal is pending in accordance with the Plan provisions. You must continue to make your required contribution.
>
> * * *

(2005 SPD at 55) (emphasis added). Thus, the 2000 and 2005 SPDs unambiguously contain a receiving LTD benefits requirement for all of the Welfare Plans. Because the Vision and Life Insurance Plans incorporate the SPD into the Plan language, for those Plans, the Court agrees

with Defendants, that coverage terminates when an employee is no longer receiving LTD benefits. The Medical and Dental Plans, however, do not incorporate the SPD in their Plan language, and the SPD's "receiving LTD benefits" requirement is not found in the Medical and Dental Plans. (*See* Medical Plan Section 22.01, Dental Plan Section 14.01). With respect to the Medical and Dental Plans, the SPD, by adding the "receiving LTD benefits" requirement, introduces ambiguity and confusion.

Like the Welfare Plans, the Pension plan also lacks any explicit "receiving LTD benefits" requirement. The Pension Plan defines "Participant" to mean "any Employee of the Employer who has met the eligibility and participation requirements." (Pension Plan at Section 2.24). And, though credited service includes "absence because of illness or disability during which the Employee is eligible for benefits under the Company's Long Term Disability Plan," it does so "only to the extent provided in Article 8," which sets forth all of the eligibility requirements for "Long Term Disability Plan Participants." (Pension Plan at Sections 2.12, 2.33, 8.2 and 8.3).

Section 8.2 states that Article 8 applies only to the following three categories of individuals:

(a) a former employee who, after the cessation of receipt of disability benefits under the Long Term Disability Plan, either returns (or returned) to the employ of an Employer or elects (or elected) to retire, or,

(b) a former Employee who, while receiving Long Term Disability Plan benefits, retires and whose eligibility to receive these benefits under the Long Term Disability Plan commenced on or after July 1, 1968, or

(c) any individual who was formerly employed by an Employer, who began receiving Long Term Disability Plan benefits before qualifying as a Participant hereunder by reason of his length of employment or by reason of the fact that he had not attained his 21st birthday, and who either returns (or returned) to the employ of an Employer or elects (or elected) retirement while receiving Long Term Disability Plan benefits.

(Pension Plan at Section 8.2). Plaintiff Smith clearly does not fall into categories (b) or (c)—he is not going to be retiring while still receiving LTD Plan benefits, and he is not contemplating a return to employment. That means Plaintiff Smith must fit within category (a) to be eligible to earn service credit as specified in Sections 2.33 and 8.3 of the Pension Plan.

Arguably, Plaintiff Smith fits within category (a) because he is a "former employee" who is no longer receiving LTD Plan benefits, and he will elect to retire. Ambiguity arises, however, if category (a) is read to require immediate retirement or return to work after the cessation of receipt of disability benefits under the LTD Plan. Review of the relevant SPD reveals that for consistency's sake, the better interpretation allows Plaintiff Smith to fall within category (a).[5]

The 2000 SPD provides: "If you qualify for benefits under the LTD plan ... you continue to earn vesting service, credited service and age and service points *during your disability*." (*Id.* at 100) (emphasis

added). In another section of the SPD, under the heading "Long–Term Disability and Your Other Columbia Benefits," the SPD states: "While you're disabled, you continue to earn service under the Retirement Plan." (*Id.* at 81).[6] The language of the SPD is also consistent with Section 8.3 of the Pension Plan which provides: A former Employee ... will receive Credited Service equal to the period for which he is eligible for benefits under the Long Term Disability Plan. (Pension Plan Section 8.3). To "qualify" or be "eligible for benefits under the Long Term Disability Plan," an individual must satisfy the LTD Plan's definition "Total Disability," which reads as follows:

You are deemed to be totally disabled while you are not able, solely because of injury or disease, to work at your own occupation, or at any reasonable occupation. (This is any gainful activity for which you are, or may reasonably become, fitted by education, training or experience. It does not include work under an approved rehabilitation program.).

(Aetna LTD Plan). The Court's interpretation is consistent with that advanced by NiSource Benefits Director Rick Bond in his deposition:

Q. How does a participant qualify for benefits under the NiSource long-term disability plan?

A. They've got to be disabled from their occupation.

Q. Anything else?

A. No.

---

**5.** *See also*, testimony from NiSource Senior Consultant in Human Resources, Lynne Aronson, explaining the SPD language: "once you qualify for benefits under the LTD plan, you continue with credited service while you remain disabled." (Aronson Depo. at 78–79).

**6.** Notably, in the same paragraph, just three sentences earlier, the SPD states: "Your med-

ical, EAP and dental benefits and your life insurance coverage continue *while you're receiving LTD benefits*." (2000 SPD at 81) (emphasis added). In contrast, there is no language in the SPD that states "receiving LTD benefits" is a prerequisite to continue to earn service under the Pension Plan.

(Bond Depo. at 23–24). Thus, the Court finds that both the Pension Plan and the SPD indicate that an individual will receive Credited Service so long as that individual satisfies the LTD Plan's definition of "Total Disability."

In summary, after review of the Welfare Plans' and Pension Plan's language, the Court finds that Defendants' contention—that the Welfare and Pension plans unambiguously require that an individual's participation cease when the individual is no longer an employee or receiving LTD plan benefits—without support. And further, an argument can be made that such "receiving LTD benefits" language does not necessarily address a situation where an individual has accepted a lump sum payment. Consequently, the Court rejects Defendants' argument that Plaintiff Smith cannot assert a claim under § 1132(a)(1)(B) because "[a]pplying plan eligibility rules in this case was a ministerial function, not an ERISA fiduciary function." (Defs.' Mot. for Summ. J. at 13). Instead, the Court finds that the termination of Plaintiff Smith constituted an adjudication of his claim for such continued disability benefits and credited service provided under the welfare and pension plans. Plaintiff Smith has, as required by *Firestone,* demonstrated that he has a "colorable claim to vested benefits." (489 U.S. at 117, 109 S.Ct. 948). Accordingly, Plaintiff Smith has standing as a participant to bring a civil action pursuant to 29 U.S.C. § 1132(a)(1)(B) "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." (*Firestone,* 489 U.S. at 117–18, 109 S.Ct. 948).

### 2. 29 U.S.C. § 1133

■ Defendants advance a similar and related argument with respect to Plaintiff Smith's § 1133 claim. Defendants argue that the "ministerial function" which resulted in Plaintiff Smith's termination of benefits was not an " 'adverse benefit determination' that would require the plans to comply with § 1133," and consequently, "§ 1133 does not provide a cause of action in this case." (Defs.' Mot. for Summ. J. at 19–20; Defs.' Memo. in Opp. at 5–7; Defs.' Reply at 10–11).

The regulations promulgated under § 1133 provide that "[e]very employee benefit plan shall establish and maintain reasonable procedures governing the filing of benefits claims, notification of benefit determinations, and appeal of *adverse benefit determinations* ...." 29 C.F.R. § 2560.503–1(b) (emphasis added). The regulations define "adverse benefit determinations" to mean "any of the following: a denial, reduction or *termination of,* or a failure to provide or make payment (in whole or in part) for, *a benefit, including any such denial, reduction termination or failure to provide or make payment that is based on a determination of a participant's or beneficiary's eligibility to participate in a plan* ...." 29 C.F.R. § 2560.503–1(m)(4) (emphasis added). In addition to this regulation, Plaintiff Smith relies on two cases—*Bard v. Boston Shipping Association,* 471 F.3d 229 (1st Cir. 2006) and *Infantolino v. Joint Industry Bd. of the Elec. Industry.,* 2007 WL 879415 (E.D.N.Y.2007)—to support his contention that Defendants' termination of his benefits was an "adverse benefit determination." Both the *Bard* and *Infantolino* courts held that a termination of benefits is an "adverse benefit determination." *See Bard,* 471 F.3d at n. 12 ("For purposes of ERISA regulations, the Board's initial determination that Bard was ineligible to apply for benefits is an 'adverse benefit determination,' notwithstanding the Plan's argument that the Board did not initially reject Bard's claim on the merits."); *In-*

*fantolino,* 2007 WL 879415 at \*4 (holding in a case where the defendant terminated health and welfare benefits absent a claim and argued that ERISA § 1133 "does not apply here because the regulation requires notice only with respect to claims that have actually been denied, and Infantolino has not alleged that he made any affirmative claim that was actually denied" that the termination of benefits is an adverse benefit determination subject to the notification requirements of § 1133 and its implementing regulations).

Despite the unambiguous language of 29 C.F.R. § 2560.503–1(m)(4) and Defendants' admission that "[b]oth courts interpreted 29 C.F.R. § 2560.503–1(m)(4) to apply to a termination of eligibility scenario," Defendants continue to argue the termination of Plaintiff's benefits was not an "adverse benefit determination." (*See* Defs.' Memo. in Opp. at 5–7). Defendants criticize Plaintiff Smith's failure to cite any Sixth Circuit authority, yet Defendants have failed to provide the Court with any court authority supporting their position. (*See Id.*). Instead, Defendants seek to rely on the following posting on the Department of Labor's website in their "Frequently Asked Questions" section:

> The regulation applies to coverage determinations only if they are part of a claim for benefits. The regulation, at § 2560.503–1(e), defines a claim for benefits, in part, as a request for a plan benefit or benefits made by a claimant in accordance with a plan's reasonable procedure for filing benefit claims. A claim for group health benefits includes pre-service claims (§ 2560.503–1(m)(2)) and post-service claims (§ 2560.503–1(m)(3)). If an individual asks a question concerning eligibility for coverage under a plan without making a claim for benefits, the eligibility determination is not governed by the claims procedure rules. If, on the other hand, the individual files a

> claim for benefits in accordance with the plan's reasonable procedures, and that claim is denied because the individual is not eligible for coverage under the plan, the coverage determination is part of a claim and must be handled in accordance with the claims procedures of the plan and the requirements of the regulations.

(Defs.' Memo. in Opp. at 7 *citing* Department of Labor Website, "Frequently Asked Questions About the Benefit Claims Procedure Regulation," available at http://www.dol.gov/ebsa/faqs/faq_claims_proc_reg.html). This section on the Department of Labor's website, however, does not negate the plain language of 29 C.F.R. § 2560.503–1(m)(4); instead, it merely echoes the regulation's definition "claim for benefits" in indicating that the claims procedure regulation "applies to coverage determinations only if they are part of a claim for benefits." (http://www.dol.gov/ebsa). This Court rejects Defendants' argument, and agrees with the *Bard* and *Infantolino* courts, which have adopted the plain meaning of 29 C.F.R. § 2560.503–1(m)(4) to hold that a termination of benefits constitutes an "adverse benefit determination" of a claim for benefits under 29 C.F.R. § 2560.503–1. And, for the reasons set forth above, the Court further rejects Defendants' contention that the termination of Plaintiff Smith's benefits was merely a ministerial function. (*See* discussion *supra* at Section III.A.1). This case is not the typical ministerial situation where an employee's benefits are cut off after they quit or are dismissed from their job. Instead, the termination of Plaintiff's benefits constituted an adjudication of his claim for such continued disability benefits and credited service provided under the Welfare and Pension Plans. Accordingly, the Court rejects Defendants' contention

that § 1133 does not provide a cause of action in this case.

## B. Plaintiff Smith's Claim under 29 U.S.C. § 1133

Count II of Plaintiff Smith's Amended Complaint alleges a claim under 29 U.S.C. § 1133. ERISA § 503, codified at 29 U.S.C. § 1133, provides:

In accordance with regulations of the Secretary, every employee benefit plan shall—

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

The Sixth Circuit has indicated that the "essential purpose" of the statute is twofold: "(1) to notify the claimant of the *specific* reasons for a claim denial, and (2) to provide the claimant an opportunity to have that decision reviewed *by the fiduciary.*" *Wenner*, 482 F.3d at 882 (*citing Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 436 (6th Cir.2006) (citation omitted)).

The regulations provide: "[e]very employee benefit plan shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination." 29 C.F.R. § 2560.503–1(h)(1). With respect to the notification of adverse benefit determina-

tions, the regulations provide: "the plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination" and that the "notification shall set forth, in a manner calculated to be understood by the claimant," the following:

(i) The specific reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedure and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination.

29 C.F.R. § 2560.503–1(g).

As set forth above, for 29 U.S.C. § 1133 claims, the appropriate standard of review is *de novo*, and this Court has adopted a "substantial compliance" test in deciding whether ERISA's notice requirements have been satisfied. *Wenner*, 482 F.3d at 882 (*citing Kent*, 96 F.3d at 807). "If the communications between the administrator and the participant as a whole fulfill the twin purposes of § 1133, the administrator's decision will be upheld even where the 'particular communication does not meet those requirements.'" *Wenner*, 482 F.3d at 881 (*quoting Kent*, 96 F.3d at 807); *see also, Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 460 (6th Cir.2003) ("In this analysis, it is crucial for us to determine whether the plan administrators fulfilled the essential purpose of § 503—notifying [the claimant] of their

reasons for denying [her] claims and affording [her] a fair opportunity for review."). The Court, in determining whether there has been substantial compliance, will consider "all communications between an administrator and plan participant to determine whether the information provided was sufficient under the circumstances." *Wenner*, 482 F.3d at 881 (*citing Kent*, 96 F.3d at 807).

■ In the instant action, on September 1, 2005, more than four years after Plaintiff Smith's benefits under the LTD plan were initially terminated in February 2001, he received a letter from Columbia Gas of Ohio which reads as follows:

Dear Mr. Smith:

Columbia Gas of Ohio received notice from Aetna Life Insurance Company that your Long Term Disability (LTD) benefit terminated February 28, 2001. Since you no longer have an employee status with Columbia Gas, you have been administratively separated retroactively to February 21, 2001.

Please contact Columbia's benefit administrator, Hewitt and Associates ... regarding impact to your applicable Health and Welfare benefits.

Sincerely,

Lynne Aronson

Sr. Human Resources Consultant

(Defs.' Mot. for Summ. J. at Ex. 10, Rock Depo. Ex. 6). Then, on September 16, 2005, NiSource sent Plaintiff Smith a letter advising him that he had accumulated 24.8333 years of Benefit Service under the Pension Plan, with credited service ending February 27, 2001. Plaintiff subsequently received communications from NiSource indicating that his Medical, Dental, Vision, Life, Accidental Death and Dismemberment Benefits had terminated effective August 31, 2005.

Defendants argue that "[a] consideration of all of these letters warrants the conclusion that Defendants substantially complied with the requirements of § 1133." (Defs.' Mot. for Summ. J. at 8–9). Defendants further posit: "it is clear that Defendants notified Plaintiff why he was ineligible to participate in the plans and afforded Plaintiff the right to a fair opportunity for review." (*Id.*). Defendants cite *Washington v. Comcast Corp.*, 268 Fed.Appx. 423 (6th Cir.2008), for support. In *Washington*, the Court found that the defendant's letter, which contained the following language, to satisfy its obligations under § 1133: "We have confirmed with your employer that you were terminated on 11/4/04. Therefore, Short Term Disability benefits have been denied effective 11/4/04." 268 Fed.Appx. at 427–28.

Once again, by relying on *Washington*, Defendants seek to treat Plaintiff's Smith's case as a typical ministerial situation where an employee's benefits are cut off after they quit or are dismissed from their job. As this Court has explained, however, the termination of Plaintiff Smith's benefits was not a ministerial function, but instead, constituted an adjudication of his claim for such continued disability benefits and credited service provided under the welfare and pension plans. (*See* discussion *supra* at Section III.A.1.). Thus, *Washington* is inapposite.

Further, the Court disagrees with Defendants' contention that their communications amounted to substantial compliance. *First*, the letters failed to notify Plaintiff Smith of the specific reasons his benefits were terminated. None of the communications referenced the plan provisions on which the determination to terminate Plaintiff Smith's benefits was based. *Second*, assuming *arguendo*, that Defendants complied with 29 U.S.C. § 1133(1), they violated 29 U.S.C. § 1133(2) by failing to

provide Plaintiff Smith with an opportunity to have the termination of benefits reviewed by the fiduciary. *See* 29 U.S.C. § 1133(2). Defendants' statement that the letters "afforded Plaintiff the right to a fair opportunity for review" is wholly disingenuous. None of the communications set forth any review procedures or informed Plaintiff Smith of his right to bring a civil action under ERISA. Nor was Plaintiff Smith advised of his right to appeal or how to do so. Finally, Defendants ignored Plaintiff Smith's counsel's attempts to obtain reconsideration by the plan administrator. (*See* Pl.'s Mot. for Summ. J. at Exs. E, F, and G, correspondence from Plaintiff Smith's counsel to Defendants requesting reconsideration dated October 26, 2005, December 13, 2005 and February 7, 2006). Accordingly, the Court finds that Defendants have clearly violated 29 U.S.C. § 1133.

 Defendants next argue that "[e]ven if . . . Defendants did not substantially comply with the requirements of § 1133, Plaintiff's claim fails because a remand would be futile." (Defs.' Memo. in Opp. at 9–10). In *McCartha*, the Sixth Circuit, despite finding a violation of § 1133, nonetheless held that the "procedural violation does not require a substantive remedy" because a remand in that case would have been a useless formality and served no useful purpose. 419 F.3d at 447 (*citing Kent*, 96 F.3d at 807) (stating that "in light of the plan language giving the fiduciary broad discretion to make coverage decisions, additional evidence is only pertinent to the extent that it shows that a fiduciary's decision was an abuse of discretion"). Defendants, to demonstrate futility, again recycle their argument that this

was simply a ministerial application of plan eligibility rules, an argument which this Court has already rejected. (*See* Defs.' Memo. in Opp. at 9–10 (Defendants' argument); *supra* at Section III.A.1. (Court's rejection of Defendants' argument)). Defendants have advanced no additional arguments or evidence demonstrating futility.[7] Accordingly, the Court now turns to the appropriate remedy for failure to comply with ERISA's notification requirements in association with a decision to terminate benefits.

In cases where the administrator terminated benefits that were already granted (rather than initially denying benefits), the Sixth and Seventh Circuits have held that retroactive reinstatement of benefits is an appropriate remedy for procedural violations in order to return the plaintiff to the status quo ante. *See Wenner v. Sun Life Assurance Co. of Canada*, 482 F.3d 878, 883–84 (6th Cir.2007); *Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621, 629–30 (7th Cir.2005).

In *Wenner*, the Sixth Circuit found that the administrator's failure to permit an appeal of the termination of disability benefits constituted insufficient compliance with the procedural requirements of ERISA. The *Wenner* Court then addressed the proper remedy for procedural violations, holding that "[u]nder these circumstances, it is appropriate to reinstate all benefits beginning from the invalid termination, as the district court did (albeit for different reasons)." 482 F.3d at 883. The Court explained its rationale as follows:

> Our aim in granting relief under ERISA is to place Wenner "in the position he . . . would have occupied but for

---

7. For example, Defendants have not argued or presented evidence indicating that Plaintiff Smith is no longer disabled. Such evidence would have made remand futile because the plan language clearly calls for a termination of eligibility for LTD benefits upon cessation of a disability.

the defendant's wrongdoing." *See Ford v. Uniroyal Pension Plan,* 154 F.3d 613, 618 (6th Cir.1998). To do so, reinstatement is necessary. As this court observed in *Sanford v. Harvard Indus., Inc.,* 262 F.3d 590 (6th Cir.2001), when an initial grant of benefits has been terminated in violation of § 1133, the benefits have *"never been properly revoked.* Thus [the] procedural violation is not the reason that [the] benefits commenced, but [it] is the reason that they should continue until a decision regarding the potential revocation of ... benefits has been properly determined in compliance with the plan's provisions." *Id.* at 599 (emphasis added); *see Schneider v. Sentry Group Long Term Disability Plan,* 422 F.3d 621 (7th Cir.2005).

\* \* \*

Finally, the other cases from this court cited by the dissent all concern the proper remedy for a § 1133 violation when the plan administrator denies a plaintiff's initial disability claim, not the termination of benefits that have already been granted. [citations omitted]

\* \* \*

We agree with the Seventh Circuit that the distinction is important: A plaintiff denied any benefits at all has no expectation of receiving them unless her claim is meritorious, and thus returning her to the status quo prior to the § 1133 violation requires only curing the procedural violation so that she may fairly pursue the merits of her claim. On the other hand, a plaintiff whose benefits have been terminated has, prior to the termination, a full expectation of continued disability payments until they are terminated by lawful procedures. Thus, "prior to the termination of her benefits by improper procedures, the status quo was that [the plaintiff] was receiving long-term disability benefits" and "the appro-

priate remedy is an order vacating the termination of her benefits and directing [the defendant] to reinstate retroactively the benefits." *See Schneider,* 422 F.3d at 629–30.

*Wenner,* 482 F.3d at 883–84.

Therefore, in accordance with *Wenner,* the Court reverses Defendants' decision to terminate Plaintiff Smith's welfare benefits and credited service under the pension plan and reinstates those benefits retroactive to the date they were terminated.

**C. Plaintiff Smith's Claim under 29 U.S.C. § 1132(a)(1)(B)**

The Court has already concluded that Plaintiff Smith has standing as a participant to assert a cause of action under 29 U.S.C. § 1132(a)(1)(B) and that the arbitrary and capricious standard of review is appropriate. Further discussion on this claim is not warranted, however, because of this Court's ruling with respect to Plaintiff Smith's 29 U.S.C. § 1133 claim.

**D. Plaintiff Smith's Estoppel and Breach of Fiduciary Duty Claims under 29 U.S.C. § 1132(a)(3)**

Plaintiff Smith, in his Motion for Summary Judgment, acknowledged that the Supreme Court has held that a plan participant may not proceed with a claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3) if they have a valid claim for wrongful denial of benefits under § 1132(a)(1)(B). (Pl.'s Mot. for Summ. J. at 30 n. 30); *Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). Consequently, Plaintiff asserts the breach of fiduciary duty claim under § 1132(a)(3) as an alternative to his wrongful denial of benefits claim under § 1132(a)(1)(B). The Court has already ruled that Plaintiff Smith has standing as a participant to assert a § 1132(a)(1)(B)

claim, and consequently, Defendants are entitled to judgment on Plaintiff Smith's estoppel and breach of fiduciary duty claims.

### E. Retaliatory Discharge Claim under 29 U.S.C. § 1140

Count IV of Plaintiff Smith's Amended Complaint asserts a claim under 29 U.S.C. § 1140. This section of ERISA makes it unlawful to discharge or otherwise discriminate against an employee for the purpose of interfering with the employee's protected rights. *See* 29 U.S.C. § 1140.

Defendants argue that they are entitled to summary judgment on Plaintiff Smith's claim for retaliatory discharge. (Defs.' Mot. for Summ. J. at 31–35). Plaintiff Smith has conceded defeat on this claim and admitted that Defendants are entitled to judgment. (Pl.'s Memo. in Opp. at 29 n. 5) ("In light of the evidence produced during discovery, Mr. Smith does not dispute that Defendants are entitled to summary judgment on that claim."). Accordingly, Defendants are entitled to judgment on Count V, Plaintiff Smith's retaliatory discharge claim.

### IV. CONCLUSION

For all of the foregoing reasons, the Court **GRANTS in part and DENIES in part** Plaintiff Smith's Motion for Judgment on the Merits and/or Summary Judgment as specified herein (Doc. 48) and **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment as specified herein (Doc. 50).

In accordance with *Wenner*, the Court reverses Defendants' decision to terminate Plaintiff Smith's welfare benefits and credited service under the pension plan and reinstates those benefits retroactive to the date they were terminated. Defendants are entitled to judgment on Plaintiff's

breach of fiduciary duty and retaliatory discharge claims.

The Clerk shall remove Documents 48 and 50 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**